UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

BRIAN S. SHEVLIN, et al.,

    Plaintiffs,

    v.

PHOENIX LIFE INSURANCE COMPANY,
et al.,

    Defendants.

CIVIL ACTION NO. 09-6323 (MLC)

**MEMORANDUM OPINION**

**COOPER**, **District Judge**

    Plaintiffs, Brian S. Shevlin, Keith P. Shevlin, and Erin R. Taylor (collectively "Plaintiffs"), brought this suit against Defendants, Phoenix Life Insurance Company ("PLIC") and Phoenix Companies, Inc. ("PNX" and collectively "Defendants"), alleging, inter alia, breach of contract and unjust enrichment following the demutualization of PLIC's predecessor, Phoenix Home Life Mutual Insurance Company ("Phoenix Home"). Defendants have moved for summary judgment. (See dkt. entry no. 136, Notice of Mot.) For the reasons that follow, that motion will be denied in its entirety.

## I.  BACKGROUND

    The undisputed facts, as developed through discovery, are as follows. Prior to 2001, Phoenix Home was a mutual life insurance company. A distinctive feature of mutual life insurance companies is that they are owned by their policyholders. Mutual life insurance companies do not have stockholders. (Dkt. entry no. 137, Reid Decl., Ex. 11, Expert Report

of Edward W. Buttner IV ("Buttner Report") at 5.)  Plaintiffs were insured by Phoenix Home pursuant to life insurance policies purchased in 1991 in New Jersey by their father.  (SMUF at ¶ 120.)[1]  Plaintiffs were eligible to receive dividends under the terms of these policies as apportioned each year by the Board of Directors of Phoenix Home in its discretion.   (Id. at ¶ 121.)

In 2000, Phoenix Home began to formulate a plan to convert from a mutual company to a stock company.  (Id. at ¶ 8.)  In December 2000 and January 2001, Phoenix Home's Board of Directors unanimously adopted a Plan of Reorganization ("the Plan"). (Id. at ¶ 9.)  In February 2001, Phoenix Home notified all of its policyholders as of December 18, 2000 about a public hearing and policyholder vote on the Plan.  (Id. at ¶ 10.)   The policyholders were sent an Information Booklet, which contained the Plan as well as financial information about Phoenix Home.  (Id. at ¶ 11.)

The materials explained to the policyholders that Phoenix Home would be renamed PLIC following the demutualization and that PLIC "would establish an accounting mechanism called the Closed Block."  (Id. at ¶ 13.)  A Closed Block is a regulatory mechanism that "is intended to address the natural tension that arises after the demutualization between participating policyholders" and shareholders and "to prevent management from reducing policyholder dividends for the purpose of benefiting shareholders" — in this case, PNX, PLIC's parent company and sole shareholder.  (See

---

[1]      "SMUF" refers to Defendants' Statement of Material Undisputed Facts (dkt. entry no. 140) and Plaintiffs' response thereto (dkt. entry no. 144-2).

Reid Decl., Ex. 9, Expert Report of J. Peter Duran ("Duran Report") at 8; see also Buttner Report at 5; SMDF at ¶¶ 2, 8.)[2]  PLIC informed the policyholders that "assets allocated to the Closed Block" and "cash flows in excess of amounts assumed" would only be available for distribution to policyholders in the form of benefits or dividends; the Closed Block assets and income generated from those assets would not "be available to [PLIC's] stockholders."  (SMUF at ¶ 16; Reid Decl., Ex. 1B, Information Booklet, Part II at 75.)

PLIC also advised its policyholders that the objective behind the Closed Block is to "ensure that the reasonable dividend expectations of policyholders . . . will be met." (SMUF at ¶ 14.) "Reasonable dividend expectations" is defined in the Actuarial Standards of Practice ("ASOP") 33 as "[t]he expectations that the current dividend scale will be maintained if the experience underlying the current scale continues, and that the dividend scale will be adjusted appropriately if the experience changes."  (Id. at ¶ 15 (quoting Reid Decl. Ex. 27, ASOP 33 at ¶ 2.7).)[3]  Plaintiffs' expert J. Peter Duran ("Duran") explains that "[s]atisfying the reasonable dividend expectations of closed block policyholders is especially important because as part of the demutualization, these policyholders gave up their ownership interests in the mutual insurance company, relying in part on management's representations that policyholders' interests, including their

---

[2]     "SMDF" refers to Plaintiffs' Statement of Material Disputed Facts (dkt. entry no. 144-1) and Defendants' response thereto (dkt. entry no. 149-1).

[3]     The Information Booklet explained the meaning of "dividend scale": "Experience-based dividend scales are actuarial formulas used by life insurers to determine amounts payable as dividends on participating policies based on experience factors relating to, among other things, investment results, mortality, lapse rates, expenses, premium taxes and policy loan interest and utilization rates." (Information Booklet, Part II at 76.)

dividend interests, would be protected and preserved post-demutualization." (Duran

Report at 9.)

> Echoing ASOP 33, PLIC explained to policyholders that it would:
>
> allocate assets to the closed block in an amount that produces cash flows which, together with anticipated revenues from the closed block policies, are reasonably expected to be sufficient to support obligations and liabilities relating to these policies, including, but not limited to, provisions for payment of claims and certain expenses and taxes, and for continuation of policyholder dividend scales in effect for 2000, if the experience underlying such scales continues, and for appropriate adjustments in such scales if the experience changes.

(Information Booklet, Part II at 75.)  The Information Booklet further provided:

> To the extent that, over time, cash flows from the assets allocated to the closed block and claims and other experience relating to the closed block are, in the aggregate, more or less favorable than assumed in establishing the closed block, total dividends paid to closed block policyholders in the future may be greater than or less than the total dividends that would have been paid to these policyholders if the policyholder dividend scales in effect for 2000 had been continued.  Dividends . . . , as in the past, will be declared at the discretion of the [PLIC Board of Directors].  These dividends may vary from time to time, reflecting changes in investment income, mortality, persistency and other experience factors, and are not guaranteed.

 (Id. at 75-76.)  PLIC notified policyholders that it would "set the dividends on the closed

block policies annually, in accordance with applicable law and consistent with the

objective of minimizing tontine effects and exhausting the assets of the closed block with

the final payment made to the holder of the last policy included in the closed block."  (Id.

at 76; see also SMUF at ¶¶ 38, 39 ("ASOP 33 states that '[a]fter the closed block is

established, the objective is to manage aggregate dividends so as to exhaust the assets

when the last policy terminates, while avoiding the creation of a tontine'" and "'the

actuary should recommend a dividend scale that is consistent with [this] goal'" (quoting ASOP 33 at ¶¶ 3.1, 3.6)).)[4]

Following a public hearing, on April 2, 2001, 95% of the policyholders that voted approved the Plan.  (SMUF at ¶ 24.)  The New York Superintendent of Insurance ("the Superintendent") approved the Plan on June 1, 2001.  In approving the Plan, the Superintendent specifically noted that "[d]ividends will be apportioned annually by [PLIC's Board of Directors] in accordance with applicable law" and "dividends are not guaranteed."  (Id. at ¶ 27.)  "On June 25, 2001, [Phoenix Home] converted from a mutual life insurance company to a stock insurance company and [became] a direct, wholly owned subsidiary of [PNX], a publicly owned entity traded on the New York Stock

---

[4]      "A tontine would be created if dividends were underpaid for an extended period of time, thereby allowing excess assets to accumulate within the closed block."  As a result, "persisting policyholders would receive a windfall, while policyholders who had terminated due to death or lapse would receive less than their equitable share of dividends."  (Duran Report at 9 (citing ASOP 33).)

Exchange and formed in conjunction with the demutualization." (Buttner Report at 5; see also SMUF at ¶ 28.)[5]

Immediately following demutualization, with respect to calculating and declaring policyholder dividends, "PLIC assumed that the dividend scale that had been in effect since January 1, 1999 would remain so, and that its underlying assumptions would

---

[5]        After the demutualization, both PLIC's policyholders and shareholders were eligible to receive dividends, subject to certain limitations. The relationship between the Closed Block, policyholder dividends, and shareholder dividends is explained as follows by Plaintiffs' expert, Edward W. Buttner IV ("Buttner"). "[T]he Closed Block assets, the cash flows generated by the Closed Block assets, and the anticipated revenues from the policies in the Closed Block can be used only for the benefit of the Closed Block policyholders, and may not inure to the benefit of the stockholders of PNX." (Buttner Report at 7.) "The post-demutualization statutory operating results of the Closed Block are distributed to Closed Block policyholders in the form of policyholder dividends and the net statutory earnings (after policyholder dividends) are included in the statutory operations result of PLIC and impact the amounts that PLIC is permitted to distribute to PNX." (Id. at 8-9.) "[T]he maximum amount of [Closed Block] earnings which may inure to PNX over the life of the Closed Block is defined by the excess of closed block liabilities over closed block assets at the demutualization date," which was $1.5 billion. (Id. at 9-10.) Upon the creation of the Closed Block, "[b]ecause the closed block liabilities exceed closed block assets, PLIC maintained excess 'residual' assets and surplus (initially $1.5 billion) in its general account that supported the Closed Block." (Id. at 11.) Over the life of the Closed Block, "[a]s Closed Block earnings are realized, and the excess of closed block liabilities over closed block assets decreases, PLIC will reduce the residual assets and redeploy the related surplus for the benefit of PNX." (Id.)
        "[T]he assets and liabilities of the Closed Block are actually held within PLIC's general account," and thus, the Closed Block needs to be accounted for in a manner that prevents excess earnings of the Closed Block from benefiting PNX. (Id. at 11-12.)

        The actuarial model projection created at the inception of the Closed Block is intended to be used as the metric for comparing the actual cumulative earnings against the projected cumulative earnings at each reporting date, to ensure that any excess earnings benefit only the Closed Block policyholders and are recognized as a liability of PLIC known as the policyholder dividend obligation or "PDO," so that PLIC's shareholder does not receive the benefit of those earnings.

(Id. at 11.) "A reduction in the PDO liability would increase [earnings calculated pursuant to Generally Accepting Accounting Principles] which . . . would result in benefits to both management and stockholders." (Id. at 23.) PDO liability can be decreased by changing the initial projections for the life of the Closed Block, known as a "glidepath." (See id.)

remain unchanged." (SMUF at ¶ 36.)  Notably, prior to Phoenix Home's demutualization, certain policies, including Plaintiffs', "had received an adjustment that set their dividends at 75.8% of the 1994 dividend scale.  When the Closed Block was funded, the 1999 scale had this adjustment embedded in it for those policies." (Id.)

Each year after the 2001 demutualization, PLIC's Closed Block Actuary gave PLIC's Policyholder Affairs Committee ("PAC") of PLIC's Board of Directors ("Board") a presentation, which included a financial report for the Closed Block and a recommendation regarding the following year's dividend actions, including whether to adjust the dividend scale.  (Id. at ¶ 45.)  The PAC would then present a recommendation to the Board regarding the Closed Block policyholder dividend scale, and the Board would vote on whether to maintain or change the dividend scale.  (Id. at ¶ 46.)  PLIC also engaged Towers Watson (formerly "Tillinghast" or "Towers Perrin"), an external actuarial firm, to assist in the dividend scale reviews in the years following the demutualization.  (Id. at ¶¶ 52, 104.) [6]

After the Closed Block's establishment in 2001, "PLIC maintained the operative 1999 dividend scale for Closed Block policies for calendar years 2001, 2002, 2003, 2004, and 2005." (Id. at ¶ 47.)   However, in reports from 2003 and 2005, Towers Watson expressed views that the dividend scales would eventually need to be reduced to assure

---

[6]     This entity will be referred to "Towers Watson" throughout regardless of the entity's name at the time of the actions in question.

that there were sufficient assets to cover liabilities in the Closed Block.  (Id. at ¶¶ 106, 107.)

For the 2006 calendar year, PLIC, for the first time since demutualization, changed the dividend scale.  In a June 14, 2005 memorandum, Vy Ho ("Ho"), the Closed Block Actuary during the 2006 dividend scale review, concluded "that (*i*) the aggregate performance as of December 31, 2004 of the Closed Block was positive, but (*ii*) the current dividend scale would not be supportable because the downward trend in interest rates would soon overwhelm the positive experience with regard to mortality."  (Id. at ¶¶ 50, 53.)[7]  An August 18, 2005 presentation by Ho and his staff and consultants to the PAC "showed that unless the dividend scale were adjusted, the Closed Block was likely to exhaust its assets in or around 2040, approximately 55 years before the likely termination of the last policy in the Closed Block."  (Id. at ¶ 54.)  And, in a November 3, 2005 presentation to the PAC, Ho and his staff and consultants provided "updated actuarial models for the Closed Block and recommended a dividend scale change that involved adjusting both the interest and mortality factors in the formula used to calculate dividends."  (Id. at ¶ 56.)  At the Board meeting on that same day, the PAC reported on the recommended dividend scale change, and the Board adopted the recommendation.  (Id. at ¶ 58.)[8]

---

[7]    The 2006 dividend scale review was based on financial data through December 31, 2004. Year-end 2005 financial data was not available at the time.  (See Buttner Report at 17.)

[8]    Plaintiffs suggest that the PAC's and Board's approval was self-interested because "all of the members of the [PAC] and the 13 Board of Directors of PLIC were shareholders of PNX," PLIC's sole shareholder.  (Dkt. entry no. 144, Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Opp'n") at 30.)

Based on the projections and calculations discussed above and following Board approval, PLIC implemented the change to the Closed Block dividend scale for the 2006 calendar year "and determined the dividend payable to each policy in the Closed Block, by applying adjustments to interest and mortality components of the 1999 scale." (Id. at ¶ 59.) Towers Watson opined that the dividend scale reduction in 2006 was reasonable. (Id. at ¶ 108.) Plaintiffs' experts Duran and Buttner disagree and assert that the dividend scale change in 2006 was two to four years premature. (Id. at ¶ 94.)

The 2006 dividend scale change resulted in a 17% aggregate reduction, or approximately $58 million, in the dividends allocated to most policies in the Closed Block. (Id. at ¶ 61; SMDF at ¶ 47; Duran Report at 39.) The reduction resulting from the 2006 scale change was even more significant in 2007 because PLIC used a practice called "pegging" for calculating the 2006 dividend. Pegging is a common practice in the industry designed to transition to a new dividend scale and mitigate the effects of a reduction. (SMUF at ¶ 87.) In calculating the 2006 dividend paid to policyholders, PLIC "'pegged[]' the 2006 dividend at 75% of the 2005 dividend." (Id.) But in 2007, pegging was no longer applied in calculating the dividend. (See id. at ¶ 88.)

PLIC maintained the 2006 dividend scale in calendar years 2007 and 2008. (Id. at ¶ 96.) PLIC again adjusted the Closed Block dividend scale for calendar year 2009,

which resulted in an additional reduction in dividends for most policies in the Closed

Block.  (Id. at ¶ 97.)[9]

During the life of the Closed Block, PLIC engaged Jack Gibson ("Gibson") of

Towers Watson to serve as the Independent Actuary for PLIC's Closed Block.  (Id. at ¶

100.)  In this role, "Gibson was required to submit opinions every five years to the New

York Department of Financial Services on whether PLIC, in establishing the Closed

Block dividend scales for the preceding five-year period, 'has acted in accordance with . .

. the Plan.'"  (Id. at ¶ 101.)   Gibson issued opinions in 2006 and 2011 in which he

concluded that the Closed Block dividend scales for each year through 2011 were

consistent with the Plan and actuarial standards.  (Id. at ¶¶ 60, 102, 110-11.)

Following the 2006 dividend scale change, which reduced Closed Block

policyholder dividends, PLIC's sole shareholder, its parent company PNX, received

---

[9]     Plaintiffs state that they do "not challenge[] the 2009 dividend scale change because the
outcome of that challenge depends on the lawfulness of the 2006 change." (Pls.' Opp'n at 1 n.2.)  The
significance of this statement was disputed by the parties at oral argument, specifically with regard to
whether Plaintiffs waived claims to damages for the dividends declared in the years following 2008.
(See dkt. entry no. 171, 6-12-14 Tr. at 13, 19, 103-04.)  Given the resolution of this motion, the Court
need not decide this issue at this juncture.

greater aggregate dividends than it had in prior years.[10]  The following chart illustrates

the dividends distributed to PNX for calendar years 2003 to 2009:

| Year | Dividend |
|------|----------|
| 2003 | $44.5 million |
| 2004 | $69.7 million |
| 2005 | $35.1 million |
| 2006 | $87.5 million |
| 2007 | $92.2 million |
| 2008 | $83.3 million |
| 2009 | $0 |

(Id. at ¶¶ 112-18.)   The members of the PAC and the Board were all shareholders of

PNX, which received those stockholder dividends.  (See SMDF at ¶ 106.)  Meanwhile,

the individual policyholder dividends of Plaintiffs decreased from about $25 to $50

before 2006 to between about $2 and $3.  (SMUF at ¶¶ 124, 131, 137.)

Plaintiffs' Second Amended Complaint alleges three causes of action against

Defendants: (1) breach of contract; (2) violation of the New York Consumer Protection

Law; and (3) unjust enrichment.  (Dkt. entry no. 23, Second Am. Compl. at 32-39.)

---

[10]     According to Plaintiffs, there is a relationship between the decreased dividends to Closed
Block policyholders and the increased dividends to PNX as sole shareholder.  As described by their
expert, Buttner, the reduction in the Closed Block policyholder dividends ultimately freed residual
assets.  Briefly explained, the residual assets are held in PLIC's general account to support the Closed
Block at the time of funding, originally in the amount of the difference between the Closed Block
liabilities and assets at funding (because liabilities exceed assets at that point in time).  As the Closed
Block's earnings increase and the liabilities decrease over time, PLIC does not need to hold as many
residual assets in its general account to cover that difference.  Therefore, a reduction in the
policyholder dividend, a liability of PLIC, would allow PLIC to redeploy more of those residual assets
for the benefit of its shareholder, PNX.  (See Buttner Report at 8-12; Pls.' Opp'n at 36.)

Plaintiffs have since abandoned their claim under the New York Consumer Protection Law.  (See Pls.' Opp'n at 39.)  Defendants have moved for summary judgment.  (See dkt. entry no. 136.)  The Court held oral argument on June 12, 2014.  (See dkt. entry no. 167.)

## II.   SUMMARY JUDGMENT STANDARD

Motions for summary judgment are governed by Rule 56, which provides that the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  The movant has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 331 (1986).  Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party."  Lamont v. New Jersey, 637 F.3d 177, 181 (3d Cir. 2011) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp., 477 U.S. at 322-23).  Summary judgment is "proper if, viewing the record in the light most favorable to the non-moving party and drawing all inferences in that party's favor, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."  United States ex rel. Kosenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009).

## III.   LEGAL PRINCIPLES

The parties dispute whether the Court should apply breach-of-contract or corporate-governance principles in evaluating PLIC's conduct.  Defendants argue that the Court must be guided by corporate governance principles and give "deference to the Board's determination

that the 2006 adjustment was appropriate in managing the Closed Block and meeting reasonable dividend expectations, absent proof of bad faith, willful neglect, or abuse of discretion." (Dkt. entry no. 149, Defs.' Reply Br. at 4.)  Plaintiffs counter that, following demutualization, policyholders are no longer company owners.  Instead, their relationship with the company is contractual and statutory, and, as such, deferential corporate governance principles are inapplicable.  (Pls.' Opp'n at 28.)[11]

The parties agree that New York law applies to their dispute.  With respect to <u>mutual</u> life insurance companies under New York law, when a policyholder challenges discretionary decisions of the directors regarding the distribution of a surplus, the courts, analogizing the situation to that of stock ownership, have stated that they "will not interfere unless there is bad faith, or willful neglect, or abuse of such discretion."  <u>Greeff v. Equitable Life Assurance Soc'y</u>, 160 N.Y. 19, 32 (1899).  "In the absence of any allegation of wrongdoing or mistake by [the officers and managers of the life insurance company], their determination of the question must be treated as proper and their apportionment of the surplus is <u>prima facie</u> to be regarded as equitable."  <u>Id.</u> at 36; <u>see also</u> <u>Kimberly-Clark Corp. v. Factory Mut. Ins. Co.</u>, 566

---

[11]    The standards governing PLIC's conduct are particularly important given that, as will be discussed <u>infra</u>, many of the aspects of the 2006 scale change challenged by Plaintiffs involved the Board's reliance on actuaries and other professionals.  Plaintiffs have argued that the Board was uninformed and relied solely on these professionals, and thus, even if corporate governance principles apply, deference to an uninformed Board is inappropriate.  (Pls.' Opp'n at 30-31.)  But according to Defendants, "[u]nder New York law, PLIC directors performing their duties of care and good faith are 'entitled to rely on information, opinions, reports or statements . . . prepared or presented by . . . persons as to matters which the director believes to be within such person's professional or expert competence.'"  (Defs.' Reply Br. at 6 (quoting N.Y. Bus. Corp. Law § 717(a)(2)).)  Thus, Defendants contend that Plaintiffs' arguments relating to the Board's ignorance of alleged errors in the dividend scale analysis is actually a winning argument for Defendants.

F.3d 541, 545 (5th Cir. 2009) ("Courts clearly consider a policyholder's <u>right</u> to a share of a surplus distribution as a matter governed by contract law whereas a policyholder's grievances with a surplus distribution's 'timing, amount, and method' are corporate governance matters and thereby insulated from most policyholder lawsuits by the business judgment rule."); <u>Towne Bus Corp. v. Ins. Co. of Greater N.Y.</u>, No. 99-120333, 2008 WL 216070, at *3 (N.Y. Sup. Ct. N.Y. Cnty. Jan. 18, 2008) ("It is true that [a mutual] insurer's directors have broad discretion as to the determination of surplus, how much the surplus should be retained by the company, and how much the surplus should be distributed to the policyholders."); <u>Fid. & Cas. Co. of N.Y. v. Metro. Life Ins. Co.</u>, 248 N.Y.S.2d 559, 567 (N.Y. Sup. Ct. N.Y. Cnty. 1963) ("In light of practical considerations, the [mutual life insurance] company is afforded a great measure of discretion in the apportionment of the divisible surplus among the various policies entitled therein, and its apportionments are prima facie deemed equitable.").

Here, however, the Court is faced with a <u>demutualized</u> company. The distinction is important because mutual life insurance companies do not have stockholders, and their owners are their policyholders. (<u>See</u> Buttner Report at 5.) The Court of Appeals for the Fifth Circuit aptly described the unique position of mutual life insurance policyholders as both owners and insureds. The court stated, the "choice between viewing a mutual insurance policyholder's claims as a matter of contract or as a matter of internal corporate governance originates with the policyholder's dual roles vis-a-vis the mutual insurance company: the policyholder is both an insured customer and also a controlling member of the insurer-company." <u>Kimberly-Clark Corp.</u>, 566 F.3d at 545. But, after demutualization, policyholders

14

are no longer the owners of the insurance company.  As a result, a tension arises between the policyholders and the shareholders, who become the owners of the demutualized insurance company, and the Closed Block is created to address this tension.  (See Buttner Report at 5; Duran Report at 8.)  In sum, the nature of demutualized companies suggests that the standards attributable to mutual company policyholders should not apply to a demutualized company's policyholders.

New York courts have generally found that the statute governing the demutualization of a mutual life insurer into a stock life insurer, N.Y. Insurance Law § 7312, does not give rise to a fiduciary relationship between the insurer and the policyholders.  See Fiala v. Metro. Life Ins. Co., 6 A.D.3d 320, 322 (N.Y. App. Div. 1st Dep't 2004); Chatlos v. MONY Life Ins. Co., 298 A.D.2d 316, 317 (N.Y. App. Div. 1st Dep't 2002).   New York courts have suggested, however, that a policyholder may be able to bring a claim against a demutualized life insurance company for breach of contract.  See Chatlos, 298 A.D.2d at 317.  The case law indicates that simply because PLIC has a Board of Directors does not mean that all of its conduct is subject to corporate governance principles.  This is especially true where its conduct in relation to its policyholders is governed by both the Plan and actuarial standards.  Cf. Ludwig v. 25 Plaza Tenants Corp., 184 A.D.2d 623 (N.Y. App. Div. 2d Dep't 1992) (Board of Directors of cooperative corporation were not insulated by business judgment rule where its actions clearly violated the express terms of the proprietary lease).

Based on the foregoing, the Court concludes that PLIC's conduct shall be judged by breach-of-contract principles.  Therefore, the deferential review associated with the business

judgment rule and corporate governance standards will not be applied.  This is consistent with the concerns arising from the tension between policyholders of demutualized insurance companies, who do not have a controlling ownership interest, and shareholders, who are owners whose profit-seeking interests are not necessarily in line with those of the policyholders.  (See Duran Report at 9 (noting that "policyholders gave up their ownership interests in the mutual insurance company, relying in part on management's representations that policyholders' interests, including their dividend interests, would be protected and preserved post-demutualization").)  The Closed Block was created, in part, to protect the reasonable dividend expectations of the policyholders, and applying a deferential standard of review to the methodology and timing of a dividend scale change — which Plaintiffs assert conflict with representations in the Information Booklet and with various actuarial standards — would erode the purposes of the Closed Block.  Thus, breach-of-contract principles will guide the analysis, and the Court will consider the Information Booklet and the actuarial standards in evaluating, whether summary judgment should be granted to Defendants.

## IV.   ANALYSIS

When applying breach-of-contract principles, the Court concludes that several material facts are in dispute, and therefore, the Court will deny summary judgment.[12]

---

[12]      This list of factual disputes is not an exhaustive list, but rather is intended to be demonstrative of the scope of the complicated, disputed issues in this matter.

16

**A.      The Creation, Use, and Significance of Glidepaths and the Policy Dividend Obligation**

One area in which material facts are in dispute centers around PLIC's accounting of the Closed Block's performance and whether the criterion that PLIC used in evaluating the need for changes to the dividend scale complied with the Plan, past practice, and the actuarial/accounting standards.  Some background on accounting principles for Closed Blocks is necessary to understand the nuances of this dispute.  "PLIC reports the operating results, assets, and liabilities of the Closed Block separately according to" both (1) Generally Accepted Accounting Principles ("GAAP") and (2) statutory accounting principles, which are required for reporting to the New York Department of Financial Services.  (SMUF at ¶ 73.)  "One key difference between GAAP and statutory accounting is that unrealized gains and losses are accounted for in a GAAP valuation of assets, but are not included in a statutory valuation."  (Id.)  GAAP principles are used to report financial performance to stockholders, whereas PLIC used statutory accounting to fund the Closed Block and evaluate policyholder dividends.  (Id. at ¶ 74.)

Upon the establishment of the Closed Block, PLIC developed a "GAAP glidepath" and a "Statutory glidepath."  These glidepaths are sequences of projected asset-to-liability ratios for the expected duration of the Closed Block, calculated separately on a GAAP accounting basis and a statutory accounting basis, respectively.  (Id. at ¶¶ 75, 76.)  The glidepaths are used to compare the projected performance of the Closed Block at the time of funding to actual performance over the life of the Closed Block, which can be upwards of eighty years since some policyholders are very young at the time of the initial funding.

17

(Duran Report at 10-11.)  In essence, a "glidepath provides a benchmark against which to measure whether the closed block is 'on track.'"  (Id. at 11.)  If the asset-to-liability ratio falls below the glidepath, this indicates that experience is worse than the funding assumptions had anticipated, and there would be a concern that the Closed Block would not have sufficient resources to meet future policy obligations unless dividends were reduced.  If, however, the asset-to-liability ratio is above the glidepath, this shows that experience is more favorable than expected at the time of funding, and the concern becomes that a tontine will be created unless dividends are increased.  (Id.; see also SMUF at ¶ 79.)  Against this backdrop of accounting principles, several related disputes have arisen.

### 1.    The "Statutory PDO"

The difference between projected performance and actual performance is known as a "Policyholder Dividend Obligation" ("PDO"), which, according to Buttner, is an additional liability of PLIC to the Closed Block policyholders. (SMUF at ¶¶ 77-79; Buttner Report at 14.)  PLIC calculated a "GAAP PDO" from the GAAP glidepath and a "Statutory PDO" from the Statutory glidepath.  (SMUF at ¶¶ 77-79.)  Buttner and Plaintiffs contend that the Statutory PDO is something that PLIC concocted and "is not a recognized concept in statutory accounting."  (Id. at ¶ 79; see also SMDF at ¶¶ 67-68; Buttner Report at 24.)  Buttner states that "[u]nlike GAAP, there is no PDO liability recorded for statutory accounting.  For statutory reporting, policyholder dividends apportioned for payment in the following policy year are recorded as a dividend liability

18

and affect statutory earnings in the year the liability is recorded." (<u>See</u> Buttner Report at 24.) Plaintiffs state that PLIC abandoned the use of the GAAP PDO in 2006 and instead created the concept of a Statutory PDO to justify a dividend scale reduction, although the Statutory PDO and GAAP PDO were both positive as of December 31, 2004. (SMDF at ¶¶ 59-60, 67-73.)

Defendants do not dispute that they created the concept of a Statutory PDO. (<u>Id.</u> at ¶¶ 66-67.) However, they defend the use of it instead of a GAAP PDO because the dividend scale analysis is done on a statutory accounting basis. (<u>Id.</u> at ¶ 67.) They dispute Plaintiffs' contention that the Statutory PDO was created for the purpose of justifying the 2006 dividend scale change. (<u>See id.</u> at ¶¶ 59-60, 67-73.) Thus, the legitimacy and the use of a Statutory PDO is a disputed concept between the parties.

## 2.    Alteration of the Glidepath[13]

Related to the dispute over the concept of a Statutory PDO, the parties also disagree about whether PLIC used the appropriate glidepath in the 2006 dividend scale review. According to Plaintiffs' experts Duran and Buttner, PLIC had developed an original glidepath at the time of funding, but then used other glidepaths for the 2006 and 2009 dividend scale reviews. (<u>See</u> Buttner Report at 16-17, 20-21, 25-27; Duran Report at 11, 23-24; Reid Decl., Ex. 10, Expert Report of J. Peter Duran in Response to Expert

---

[13]    The Court's discussion of "glidepath," in this and subsequent subsections of the opinion, unless otherwise indicated, does not attempt to specify which version of the glidepath is the topic, because the parties' submissions do not always make that distinction in discussing these particular issues, nor would it affect the outcome of this motion.

Report of Darryl Wagner ("Duran Rebuttal Report") at 12.)  They opine that the use of

other glidepaths contravened the directive of the American Institute of Certified Public

Accountants in Statement of Position 00-3 ("SOP 00-3"), which provides that the

"original GAAP glidepath is intended to serve as the benchmark against which to

measure all future closed block earnings," and "[i]t may not be changed."  (Duran Report

at 23-24; see also Buttner Report at 16-17, 20-21.)

> Buttner explains the significance of changing the glidepath as follows:

> If PLIC complied with [SOP 00-3], the earnings which inure to
> shareholders are "capped" or "locked in" at the amounts defined by the
> actuarial projections determined at the time of the demutualization of PLIC.
> . . . However, if the Closed Block policyholder dividends are reduced and
> the Glidepath modified, as was the case in this instance, then there would
> be potential to report increased GAAP earnings that inure to stockholders
> above what would be available if the Glidepath and Closed Block
> policyholder dividends were unchanged.
> . . . For statutory reporting, . . . [t]he dividend scale change effective
> January 1, 2006 . . . had the effect of reducing the statutory dividend
> liability as of year-end 2005, which in turn, increased 2005 statutory
> earnings in an amount equal to the dividend liability reduction.  Thus, in
> years the amount of dividends that should otherwise be paid are reduced,
> statutory earnings are higher than they otherwise would have been but for
> the eliminated/reduced policyholder dividends.  In other words, by reducing
> Closed Block policyholder dividends[,] PLIC's statutory earnings are
> higher, which increased the stockholder dividend that PLIC may pay to its
> parent, PNX.
> Stock insurance companies, such as PLIC, are allowed to pay dividends to
> its stockholders based on the insurance company's financial results
> determined in accordance with statutory accounting principles. . . . Under
> New York Insurance Law Sec. 4207, domiciled stock life insurers may pay
> to their shareholders the lesser of prior year statutory gain from operations
> or 10% of prior year statutory surplus.  Therefore, a reduction in Closed
> Block policyholder dividends would allow PLIC to pay greater stockholder
> dividends to PNX.

> As a result of the [2006 dividend scale change], PLIC was able to increase its shareholder dividend to PNX by $30 million in 2006, $9 million in 2007, and $13 million in 2008.

(Buttner Report at 23-24.)  Defendants do not dispute that if the 2006 dividend scale had not been changed, PLIC's statutory gain from operations and its statutory surplus under N.Y. Insurance Law § 4207 would not have been as high as they ultimately were.  (Dkt. entry no. 172, 6-26-14 Letter at 7.)  Defendants also admit that a reduction in the 2006 policyholder dividend scale provided PLIC with the right, under N.Y. Insurance Law § 4207, "to pay a shareholder dividend . . . that was $39.7 million higher than if it had not reduced the scale."  (Id.)  Nonetheless, Defendants emphasize that the decision to pay shareholder dividends is discretionary and that "no assets from the Closed Block were used to pay the shareholder dividend that PNX received in 2006" or thereafter.  (Id. at 7-8.)

Notwithstanding the impact on potential shareholder dividends from a dividend scale change, Defendants dispute the existence of this modification to the glidepath. (SMUF at ¶ 78.)  The Court concludes that there is a dispute of material fact regarding whether PLIC altered the glidepath and the accounting significance of any such alteration.  This dispute precludes the entry of summary judgment.

### 3.     Change in "Experience"

The parties further dispute whether PLIC could make the changes to the dividend scale for 2006 given the comparison of actual results to the glidepath.  The parties agree that ASOP 33's definition of reasonable dividend expectations relies heavily on

"experience" — if the experience underlying the scale persists, the scale "will be maintained" but if that "experience changes," the "dividend scale will be adjusted." (ASOP 33 at ¶ 2.7.)  And ASOP 15 defines "actual experience" as "[h]istorical results within a dividend factor class and trends in those results."  (Reid Decl., Ex. 25, ASOP 15 at ¶ 2.1.)  The parties disagree, however, about what is meant by the word "experience." Plaintiffs argue that "experience" can only be measured retrospectively, but Defendants contend that trends in experience include prospective projections.

It is undisputed that, at the time of the 2006 dividend scale analysis, the Closed Block's actual performance exceeded the expectations at the time of funding, as evidenced by the glidepath.  Both of Plaintiffs' experts, Duran and Buttner, agreed that performance was above the original glidepath and that GAAP PDO and Statutory PDO were positive at the time of the 2006 analysis.  (Duran Report at 26; Buttner Report at 18-22.)  The Closed Block Actuary, Ho, and Defendants' expert Darryl Wagner confirmed that at the time that the 2006 dividend scale was analyzed, the Statutory PDO was positive because of the favorable mortality experience in the Closed Block, meaning that policyholders were living longer and thus more premiums were paid to PLIC and less coverage was paid by PLIC.  (Reid Decl., Ex. 12, Report of Darryl G. Wagner ("Wagner Report") at 4; id. at Ex. 43, 6-14-05 Mem. at 14.)  The parties dispute whether PLIC could, consistent with the actuarial standards and the Information Booklet, modify the dividend scale at a time when actual performance still exceeded expectations.

In addition to this more general dispute regarding whether PLIC was permitted to reduce the scale at a time when performance exceeded expectations, there is a disagreement relating to whether PLIC was required to wait until performance varied from the glidepath by a particular threshold amount before a scale change was permitted. Memoranda in the record from PLIC's actuaries that, when read in a light most favorable to Plaintiffs, suggest that PLIC made some representations that it would not change the dividend scale unless performance deviated from the glidepath by more than 0.50%, or, in other words, 50 basis points.  (See, e.g., Reid Decl., Ex. 38, 4-15-04 Mem.; dkt. entry no. 145-1, Fisher Decl., Ex. 8, 3-29-04 Mem.)  A memorandum from March 29, 2004 regarding the "Closed Block Asset Adequacy Analysis for 2003" for PLIC states in relevant part:

> The [asset-to-liability ratios] generally will not deviate from the [glidepath] by more than 0.50% in any year.  A dividend adjustment is triggered if this threshold is violated.  This threshold was chosen to eliminate having to make changes in the dividend scale for modest deviations from the [glidepath], which is consistent with [PLIC's] past dividend scale changes.

(3-29-04 Mem. at 2-3.)  And an April 15, 2004 memorandum by Towers Watson, which addressed PLIC's 2003 dividend actions, similarly states:

> Based on these projections, if experience follows the current best estimate assumptions, a change (reduction) to the dividend scales will be needed at some point to bring the Closed Block back on the Glidepath and assure that there are sufficient assets to support the liabilities.  However, it is not necessary to reduce the dividend scales immediately to meet this objective.
>
> [PLIC] has indicated that they would likely reduce the dividend scales if the ratio of Closed Block assets to liabilities fell below the Glidepath by more than 0.50%, or if pre-tax profits from the Closed Block drop below around

23

$25 million.  Based on the results of these projections, a reduction in dividends would be warranted around 2006 or 2007.
. . .

Based on the current position of the Closed Block and the projection of the Closed Block as of September 30, 2003 using assumptions updated for recent experience, [PLIC] concluded that no dividend scale change is needed for the 2003 dividend scale (though a change will be needed eventually if experience plays out as assumed).

(Id. at 5.)

The parties dispute the significance of the actuarial standards, the Information Booklet, and these memoranda on the timing of the dividend scale change.  Plaintiffs have argued that actual experience must have already fallen below the glidepath — by at least 50 basis points — in order for the scale to be changed.  They contend that the word "experience," as used in the actuarial standards and the Information Booklet, refers to the performance of the Closed Block as measured retrospectively, not prospectively.  (Pls.' Opp'n at 24.)  They assert that PLIC improperly changed the dividend scale at a time when the actual performance of the Closed Block was positive as compared to the glidepath because PLIC relied upon future projections that performance would soon fall below the glidepath.  (See id. at 23-24.)  Plaintiffs argue that, while the Information Booklet preserves PLIC's right to increase dividends if performance exceeds expectations and decrease dividends if permanence is less favorable than assumed, "[n]owhere does PLIC reserve the right to **reduce** dividends when the performance" is better than was assumed.  (Id. at 24.)  Plaintiffs' experts opine that positive performance "is inconsistent

with a determination to decrease policyholder dividends."  (Buttner Report at 19-22, 27-28; see also Duran Report at 2.)

Defendants argue that neither the Plan nor the actuarial standards require negative performance prior to changing the dividend scale.  (See dkt. entry no. 140-1, Defs.' Br. in Supp. of Mot. for Summ. J. ("Defs.' Br.") at 24-26.)  In fact, ignoring future projections in evaluating the dividend scale runs contrary to the directive in the actuarial standards that a Closed Block should be managed "to avoid future exhaustion of assets or tontines." (See id. at 24-26.)[14]  And while the Closed Block performance was positive at the time of the 2006 scale change, interest rates were lower than the funding assumption.  As a result, PLIC's actuaries believed that the interest rate factor would eventually overwhelm the positive mortality experience, and thus, they did not expect the projected performance of the Closed Block to remain positive.  (See Wagner Report at 4; 6-14-05 Mem. at 14.) PLIC reported on August 18, 2005 that, without a reduction in the dividend scale, the Closed Block's Statutory PDO as of the end of 2005 would be -$52.0 million.  (SMUF at ¶ 82.)  Defendants argue that Plaintiffs' disagreement with the timing of the dividend scale "does not mean that PLIC's analysis and determination were outside the bounds of professional judgment."  (Defs.' Br. at 23.)  They further assert that Plaintiffs' reliance on PLIC's purported requirement of a 0.50% drop in the asset-to-liability ratio is misplaced.

---

[14]     Duran counters this line of argument, explaining that projections should not have been used by PLIC in deciding whether to make a dividend scale change in the first place; however, once the time had come for a dividend scale change, meaning that historical experience deviated sufficiently from the glidepath, it is appropriate for management to consider projected future performance in implementing the scale change.  (Duran Rebuttal Report at 4-6.)

They contend that this was not a firm rule and that "a 50-basis-point change was an assumption incorporated into a model created to conduct various sensitivity analyses in connection with a potential securities transaction."  (Id. at 27.)

Viewing the summary judgment record in the light most favorable to Plaintiffs, the Court cannot conclude, as a matter of law, that Defendants are correct that negative performance was not a prerequisite to a dividend scale change.  With regard to when dividend scale changes may be made, both ASOP 15 and 33 and the Information Booklet and supporting documents focus on the "experience" of the Closed Block.  But the meaning of the word "experience" is ambiguous and is disputed by the parties.  (See Pls.' Opp'n at 16 ("The parties disagree on the definition of the term, 'experience.'").)  There is a dispute of material fact regarding whether (1) performance was required to have already fallen below the expected performance of the Closed Block, as evidenced by the glidepath, before PLIC could change the dividend scale; and (2) PLIC had a threshold amount of deviation from the glidepath that was required before PLIC could alter the scale.  The Court must draw inferences in Plaintiffs' favor for the purposes of this motion, and the April 15, 2004 memorandum can be read to suggest that "experience" means past performance and actual results.  Specifically, the memorandum uses language such as "if experience follows the current best estimate assumptions" and "if experience plays out as assumed."  (See 4-15-04 Mem. at 5-6.)[15]  A factfinder could reasonably infer

---

[15]     The same language appears in Towers Watson's memorandum reviewing PLIC's 2002 Dividend Actions.  (See Reid Decl., Ex. 34, 1-6-03 Mem.)

that, if projections and future performance were subsumed within the meaning of the word "experience," the memorandum would not have needed to condition the likelihood of future dividend scale changes on the projections becoming a reality.

The statements in the memoranda relating to the 50-basis-point threshold contribute to the ambiguity surrounding the word "experience." Defendants' argument that this threshold was related to a potential securitization transaction and was unrelated to a dividend scale change is belied by the language in the memoranda, which specifically references this threshold in the context of future dividend scale changes. (See Duran Rebuttal Report at 12.) This ambiguity is another reason why the Court cannot enter summary judgment in favor of Defendants.

**B.    Methodology for Calculating Dividends**

Another area of disputed fact involves the methodology used by PLIC in setting the policyholder dividends. In addition to arguing that the scale change was premature as actual experience was still positive, Plaintiffs contend that it was inappropriate for PLIC to change the methodology it used to set dividends even if a dividend scale change were warranted in 2006. Specifically, they assert that PLIC, in contravention of the Information Booklet and actuarial standards, used a different reinvestment rate in setting the 2006 dividend scale analysis than it had used in determining assets needed to fund the Closed Block. (Pls.' Opp'n at 25-27.) Defendants counter that (1) they did not use a different reinvestment rate (see Defs.' Reply Br. at 11; Defs.' Br. at 26-27), and,

27

alternatively, (2) nothing prevented PLIC "from changing its reinvestment rate assumptions in response to observed trends." (Defs.' Reply Br. at 9.)

In "determining the total assets needed to fund the Closed Block upon demutualization," "PLIC assumed, in the actuarial models and projections . . . a reinvestment rate of return based on a historical average portfolio rate of return." (Reid Decl., Ex. 8, Defs.' Responses & Objections to Pls.' First Request to Admit at 4.)  In the 2003 dividend scale analysis, however, PLIC reviewed the experience of and projections for the Closed Block "using a reinvestment rate based on future U.S. Treasury rates implied by the forward interest rate yield curve." (SMUF at ¶ 66.)  During the period of December 31, 2000 to December 31, 2004, the 10-year U.S. Treasury rates had dropped from 5.12% to 4.24% — although the 2004 rate was higher than the 2003 rate.  (Id. at ¶ 69.)  These rates were lower than the reinvestment rate assumptions used in the Closed Block funding, which ranged from 7.04% to 7.69% for the various lines of business within the Closed Block.  (See id. at ¶ 65; see also Duran Report at 28.)  As of September 30, 2003, PLIC updated those rates to 6.04% to 6.38%.  (See 4-15-04 Mem. at 3.)  And "[i]n its 2006 Closed Block dividend scale analysis, PLIC assumed a reinvestment rate of return based on the December 31, 2004 forward interest rate yield curve." (SMUF at ¶ 70.)  This "produced a projection that the Closed Block assets would be exhausted at a

date earlier than if a weighted historical average based on PLIC's experience in 2002, 2003, and 2004 had been used in the actuarial model." (Id. at ¶ 71.)[16]

Plaintiffs argue that the change in the reinvestment rate assumptions for the 2006 dividend scale analysis from the assumptions used at the time of funding was inappropriate. They rely on the fact that the Plan of Operation that PLIC submitted to the New York Insurance Department, which was Exhibit K to the Plan of Reorganization and thus was disseminated to policyholders, states, in a section relating to the actuarial assumptions utilized in the Plan of Operation, "reinvestment rates are consistent with the rates used in the closed block calculation." (Pls.' Opp'n at 25-26 (citing Fisher Decl., Ex. 3, Plan of Operation for PLIC at 22).) They further argue that the change in the interest rate assumption is inconsistent with actuarial standards, specifically ASOP 33, which provides in part, "The actuary should choose a reinvestment rate assumption that is directly related to the company's practice for determining its current dividend scale." (Id. at 17-18 (quoting ASOP 33 at ¶ 3.4.1).)

Plaintiffs' expert Duran further explained:

[T]his change in approach will result in lower projected reinvestment rates and therefore lower projected asset to liability ratios. This in turn means that more severe dividend reductions are required. The change in approach therefore violated the reasonable expectation that the dividend scale changes after demutualization would be based on the same methodologies as before demutualization subject to the constraint of paying out closed block assets as the last policies terminate without creating a tontine.

---

[16]     Plaintiffs' expert Duran asserts in his report that PLIC first changed the reinvestment rate for the 2006 dividend scale analysis. (Duran Report at 28-29.) This is contradicted by Towers Watson's review of the 2003 dividend scale analysis, which references the use of a forward yield curve as of September 30, 2003. (4-15-04 Mem. at 3.)

(Duran Report at 28.)  Duran also notes that, had PLIC relied upon the forward yield curve as the reinvestment rate at the time of the Closed Block funding, the actuarial calculations would have indicated a need for additional assets to fund the Closed Block. (Duran Rebuttal Report at 4.)  Moreover, he states that PLIC's changing of the methodology in the absence of a change in experience would necessarily result in the actuarial calculations suggesting a need to change the dividend scale.  (Id. at 4, 8.)  Duran concluded that if the proper reinvestment rate had been used, the point in time that projections would have shown a sufficient deviation from the glidepath "to trigger a dividend scale change would have been substantially deferred."  (Duran Report at 30.)

Defendants respond that they did not in fact change the methodology.  They assert that PLIC had used the forward yield curve "no later than the dividend scale review for 2003, within two years of the establishment of the Closed Block, and three years before the dividend scale was changed in 2006."  (Defs.' Reply Br. at 11; see also Defs.' Br. at

27.)[17]  Moreover, Defendants argue that, even if they had changed the methodology,

"[n]one of the materials cited by Plaintiffs supports their contention that PLIC must

manage the Closed Block, over its projected life of nearly a century, with recourse only

to past historical and economic data."  (Defs.' Reply Br. at 9-10; see also Defs.' Br. at

27.)  Defendants emphasize that ASOP 33 also provides, in part, that when an actuary is

reviewing the operations of an existing Closed Block and advising a company, the

actuary should "recommend a dividend scale that is consistent with the goal of

exhausting the assets when the last policy terminates, while avoiding the creation of a

tontine." (Defs.' Reply Br. at 10 (quoting ASOP 33 at ¶ 3.6).)  They argue that the

portion of ASOP 33 cited by Plaintiffs, section 3.4.1, which states that the reinvestment

rate chosen should be related to PLIC's practices for determining the current dividend

---

[17]      While not raised in either their briefing or their statement of undisputed facts, Defendants
suggested at oral argument that PLIC had actually used a forward yield curve at the time of the Closed
Block funding.  Specifically, they point to a section of the Plan of Operation, which states that the
projections calculated during the demutualization process for the years 2000 to 2010 "assume[d] a
level yield curve scenario throughout the projection period."  (See 6-12-14 Tr. at 109, 132-33 (citing
Plan of Operation for PLIC at 8).)  Defendants argued, at oral argument, that this demonstrates the
methodology used for the 2006 dividend scale change was consistent with the methodology used at
the time of the Closed Block funding because the Plan of Operation references as "yield curve," and
"all yield curves to the extent you're going to apply them in the future is a forward looking yield
curve."  (See id. at 133.)  Plaintiffs contest the significance of this passage from the Plan of Operation.
They assert that the quoted language does not address reinvestment rates, and elsewhere, the Plan
states, "Reinvestment rates are consistent with rates used in the closed block calculations."  (Id. at 125
(citing Plan of Operation for PLIC at 22).)  Plaintiffs further highlight the reference to the "yield
curve" is modified by the word "level," meaning that "[t]he individual who prepared that model had to
incorporate some interest assumption, but he used a level assumption.  He didn't use anything that
changed."  (Id.)  The Court concludes that the language of the Plan of Operations relating to a "level
yield curve" further contributes to the factual disputes in this matter, particularly when compared with
Defendants' other statements on the record regarding the reinvestment rate used in the Closed Block
funding calculations.  (See, e.g., SMUF at 64-66; Defs.' Response & Objections to Pls.' First Request
to Admit at 4.)

scale, relates to funding assumptions and does not speak to the requirements on the actuary after the establishment of the Closed Block.  (Id. at 11-12 n.3.)  Defendants additionally claim that the Plan explicitly warns that the projections and estimates are uncertain and could change in the future.  (Id. at 9-10.)

The record is undisputed that PLIC did not, for the first time, use the forward yield curve in the 2006 analysis.  Nevertheless, there is a dispute of material fact (1) whether PLIC, in the dividend scales reviews following the demutualization, used a different reinvestment rate than the one used for the Closed Block funding and (2) if so, whether PLIC was permitted, by the Plan and by actuarial standards, to change the reinvestment rate it used for its projections following demutualization.  The Plan and actuarial standards certainly vest actuaries with discretion in modifying and analyzing the dividend scale.  But there is language, when read in the light most favorable to Plaintiffs, suggesting that such discretion does not include the discretion to change the methodology used at the time of the funding of the Closed Block.  Moreover, the Court believes that the trier of fact could credit Duran's expert opinion that a change in methodology violated the policyholders' reasonable dividend expectations that, while changes in experience could result in modifications of their dividends, the manner of determining that experience would not change following demutualization.  Thus, the existence of a change in the reinvestment rate and the propriety of such a change under the actuarial standards and the Plan are questions for the trier of fact.

C.     **Dividend Adjustments**

Plaintiffs have also challenged PLIC's purported change in methodology relating to

certain dividend adjustments.  Plaintiffs claim that PLIC allegedly "failed to disclose the fact

that the dividend scale change [in 2006] resulted in the elimination of the dividend floor that

had been embedded in the 1999 dividend scale" setting Plaintiffs' dividends at 75.8% of the

1994 scale.  (See SMUF at ¶ 91; dkt. entry no. 140-2, Frank Aff. at ¶ 4; Duran Report at 13-

14, 32.)  Byron Frank, the Vice President of PLIC and PNX, averred in his affidavit that,

"[w]hen the Closed Block was funded, the 1999 scale that was continued at that time had this

adjustment embedded in it for those policies," although the Information Booklet did not

reference the adjustment nor did it state that this floor would be maintained.  (Frank Aff. at ¶

4.)  According to Mr. Frank, "the adjustment, as part of the 1999 dividend scale, was subject

to the general disclosures that the dividend scale would be adjusted if experience changed."

(Id.)  Plaintiffs argue that, because — as previously discussed — the "experience" had not

"changed," the elimination of this dividend floor thwarted their reasonable dividend

expectations.  (Pls.' Opp'n at 15-16.)  Defendants respond that the subjective beliefs of

individual policyholders are not relevant to the concept of reasonable dividend expectations.

(Defs.' Br. at 28.)  Even if they were relevant, Defendants contend that "there is no evidence

that [Plaintiffs] or any other policyholder were advised of this so-called practice, which flies

in the face of contract language that makes clear that there is no promise of dividends."  (Id.)

Plaintiffs also assert that, prior to demutualization, PLIC computed "the final

policyholder dividend by starting with a basic dividend, adjusting for interest and mortality,

33

and then making certain positive adjustments for a 'minimum dividend,' 'merger expense' and pegging." (SMDF at ¶ 99.) However, Plaintiffs contend that "[i]n connection with this 2006 dividend scale change, PLIC changed the order of adjustments by applying the interest and mortality adjustment after the positive adjustment." (Id. at ¶ 102.) According to Duran, adjusting for interest and mortality after the dividend floor adjustments "negat[ed] their effect." (Duran Report at 33.) This application of the interest and mortality factors after the positive adjustments purportedly resulted in "dividends that normally would have been $42 [being] reduced to $0." (SMDF at ¶ 103.) Duran opined that "this ordering is unrelated to experience factors. Post demutualization, dividends should be adjusted based only on differences between actual and anticipated experience. The reordering of the application of these adjustments clearly violates this principle." (Duran Report at 33.) He concluded, "this change in methodology violated policyholders' reasonable dividend expectations, the Closed Block's operating rules and ASOP 33." (Id.) Mr. Frank responds that PLIC did not in fact change the order in which the adjustments were applied. (See Frank Aff. at ¶ 4; Defs.' Reply Br. at 13.)

The Court concludes that, viewing the facts in the light most favorable to Plaintiffs, there is a dispute of fact as to whether (1) the order of the application of the dividend adjustments was changed and (2) under the actuarial standards and the terms of the Plan, changes to the order of the dividend adjustments or the elimination of the dividend floor violated the reasonable dividend expectations of PLIC's policyholders. This factual dispute relates to the dispute concerning the meaning of the word "experience," specifically whether

these types of changes could be made when the Closed Block was still performing better than anticipated at the time of the 2006 dividend scale change.

### D.      DAC Tax Asset

Plaintiffs also challenge PLIC's 2006 dividend scale actions because the calculations and models that PLIC relied upon in evaluating the dividend scale and implementing changes to that scale contained an error.  When the Closed Block was formed, the "models and projections used for determining the total assets needed to fund the Closed Block upon demutualization" included a Deferred Acquisition Cost ("DAC") tax asset.  (SMUF at ¶ 83.)  As explained by Duran, under GAAP, "companies can defer certain acquisition expenses by means of establishing" a DAC tax asset, which "represents the value of the tax deductions to be received in the future as the DAC balance is amortized."  (Duran Report at 19.)  There is "real economic value to be realized in the future as the deductions are taken."  (Id.)  However, when PLIC performed its 2006 dividend scale review, PLIC failed to include the DAC tax balance in its model.  (SMUF at ¶ 85; Reid Decl., Ex. 54, 7-24-06 Mem. at 10.)  According to Mr. Frank, the omission was the result of "human error" because the DAC tax balance was not automatically included in the software used by PLIC actuaries for modeling; rather, it had to be input manually.  (Frank Aff. at ¶ 5.)  The omission was noted on July 24, 2006 by Towers Watson in its review of PLIC's 2006 dividend actions.  (SMUF at ¶ 84.)  Towers Watson "recommend[ed] including the amortization of the DAC tax balance in the

model, since it is sizeable ($248 million as of September 30, 2005) and would increase the projected asset to liability ratio." (7-24-06 Mem. at 10.)

Towers Watson wrote in an October 2006 report that, assuming a tax rate of 35%, the "unamortized DAC tax balance [was] approximately $83 million (on an after-tax basis) as of December 31, 2005." (SMDF at ¶ 80.) The report further stated, "This balance will provide dividend capacity of approximately $128 million in aggregate over the next ten years and approximately $28 million in the first year of the model." (Id.) Duran, using the corporate tax rate of 36%, estimated the value of the DAC tax benefit as of September 2005 as $89 million. (Duran Report at 31.) Duran opined that the omission of the DAC tax benefit from the projections resulted in an understatement of the projected asset-to-liability ratio relied upon for the 2006 dividend scale analysis. (Id.) He concludes that, "had [PLIC] properly included the runoff of the tax-basis DAC in the projection, [PLIC's] supposed need to reduce dividends beginning in 2006 would have been less credible or justifiable." (Id.)

Plaintiffs, on the one hand, argue that the failure to include the DAC tax asset in the model undermined the need for the 2006 dividend scale change. (Pls.' Opp'n at 21.) They assert that the omission was not immaterial because, per Towers Watson, the DAC tax asset had a $28 million dividend capacity in the first year, which "was nearly half of the $58 million policyholder dividend reduction in 2006 alone." (See id. at 22.) And, given that it was valued at $83 million, the DAC tax asset "exceeded the value of every other asset in the Closed Block in 2006." (Id.) They contend that the reason for the omission is irrelevant

under a breach-of-contract analysis given that PLIC failed to adhere to the Plan.  The failure

to include this asset allowed the asset to be used to benefit non-Closed Block business, which

violated the Plan and frustrated the reasonable dividend expectations of the policyholders.

(Id. at 22-23.)

Defendants, on the other hand, argue that, because "the DAC tax asset amounted to

just about $8.3 million per year," it was immaterial, and "an actuary could reasonably have

concluded that it was not material to the dividend scale analysis."  (Defs.' Br. at 29-31; see

also Defs.' Reply Br. at 12-13.)  "In contrast, during the period PLIC was considering whether

to adjust the dividend scale, Closed Block assets and liabilities stood at more than $8.6 billion

and roughly $10 billion respectively — each more than 100 times the total value of the

omitted asset."  (Defs.' Reply Br. at 12.)  Defendants also emphasize that, notwithstanding the

omission of the DAC tax asset in the 2006 dividend scale calculations, the Independent

Actuary Gibson, who was aware of the omission, issued reports to the New York Department

of Financial Services in 2006 and 2011 in which he opined that PLIC's Closed Block

dividend scales through 2011 were consistent with the Plan and actuarial standards.  (SMUF

at ¶ 103.)

The Court cannot conclude on this record as a matter of law that the omission of the

DAC tax asset was immaterial to the 2006 dividend scale analysis.  While there is substantial

evidence that it was small in comparison to the overall size of the Closed Block, there is

evidence that it was the largest asset in the Closed Block.  Viewing this evidence in the light

most favorable to the Plaintiff, the Court concludes that the trier of fact could credit Duran's

opinion that, had the DAC tax asset been properly included, the asset-to-liability ratio

projections would have undermined the purported need to reduce the dividend scale at that

point in time.

**E.     Unjust Enrichment Claim**

The factual premise of Plaintiffs' unjust enrichment claim against PNX, and the legal

theory underlying it, are essentially the same as Plaintiffs' breach-of-contract claim.  (See

Pls.' Opp'n at 38-39.)  Defendants argue that Plaintiffs' unjust enrichment claim is precluded

by the existence of a contract regarding the same subject matter.  (Defs.' Br. at 37 (citing

Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388-89 (N.Y. 1987) ("The

existence of a valid and enforceable written contract governing a particular subject matter

ordinarily precludes recovery in quasi contract for events arising out of the same subject

matter.")); see also Defs.' Reply Br. at 14.)  However, that presumes that a contract exists

between the parties in question.  Plaintiffs have a contractual relationship with PLIC based

upon their life insurance policies.  But Plaintiffs are not in privity of contract with PNX, the

corporate parent that Plaintiffs allege received excess and undue enrichment as a result of

PLIC's dividend actions.  Therefore, while a breach-of-contract claim may be the appropriate

vehicle to recover damages from PLIC, it is not the appropriate vehicle for Plaintiffs' claims

against PNX, and Plaintiffs' claims against PNX are not precluded by Plaintiffs' contractual

relationship with PLIC.  See Howe v. Bank of N.Y. Mellon, 783 F. Supp. 2d 466, 485-86

(S.D.N.Y. 2011) (existence of a contract between a plaintiff and another party did not

preclude unjust enrichment claim against third party since the contract does not govern the

rights and obligations of the plaintiff and the third party).  Because the unjust enrichment claim against PNX is based upon the same disputed facts as previously discussed, summary judgment must also be denied on the unjust enrichment claim.

## V.     CONCLUSION

The Court concludes that genuine disputes of material fact preclude the entry of summary judgment in favor of Defendants.  A resolution of one or more of the factual disputes in Plaintiffs' favor could suggest that Defendants failed to abide by the actuarial standards and the Plan during the 2006 dividend scale analysis.  Such a finding could undermine the need for the change in the dividend scale for the 2006 year, and thus may entitle Plaintiffs to relief.  (See, e.g., Duran Report at 32 ("Had the projections used to support the dividend scale recommendation to the Board used an appropriate reinvestment rate and taken account of the runoff of the existing tax basis DAC asset, the supposed need for a dividend scale change would have been deferred.").)   These are questions for the trier of fact. Therefore, the motion for summary judgment (dkt. entry no. 136) will be denied.


        s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge


Dated: June 30, 2014