UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

-------------------------------------------------------- x
                                                :

BRIAN S. SHEVLIN, KEITH P. SHEVLIN,
AND ERIN R. TAYLOR, ON BEHALF OF     :
THEMSELVES AND THOSE SIMILARLY
SITUATED,                                      :    Docket No. 09-cv-6323-MLC-TJB

                   PLAINTIFFS,    :
                                            Oral Argument Requested

     v.                                   :
                                       Return Date: October 5, 2015

Phoenix LIFE INSURANCE COMPANY AND:
Phoenix COMPANIES, INC.,
                                         :

                   DEFENDANTS.
                                         :
-------------------------------------------------------- x

## BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE CERTAIN EXPERT TESTIMONY

DEBEVOISE & PLIMPTON LLP
  Joseph P. Moodhe
  Natalie L. Reid
919 Third Avenue
New York, New York 10022
(212) 909-6000

PODVEY MEANOR CATENACCI HILDNER
COCOZIELLO & CHATTMAN,
A PROFESSIONAL CORPORATION
  Sheldon M. Finkelstein
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
(973) 623-1000

*Attorneys for Defendants Phoenix Life Insurance Company and The Phoenix Companies, Inc.*

# TABLE OF CONTENTS

Page

Table of Authorities ............................................................................................ iii

Preliminary Statement .......................................................................................... 1

Procedural Background ......................................................................................... 3

Factual Background .............................................................................................. 5

Argument ............................................................................................................. 7

I.      Standard for Class Certification ................................................................. 7

II.     Plaintiffs Fail To Meet the Requirements of Rule 23(a) ............................. 9

        A.      Plaintiffs Have Failed to Establish That They Are Members of
                the Proposed Class ........................................................................... 9

        B.      The Typicality and Adequacy Requirements of Rule 23(a)(3)
                and (4) Are Not Met. ...................................................................... 12

                1.      Not All Policyowners in the Proposed Class Suffered
                        Class Damages. ..................................................................... 15

                2.      Current Policyowners Have Interests Adverse to Class
                        Members Whose Policies Are No Longer In Force ................. 17

                3.      Those Purportedly Entitled to "Minimum Dividends" Are
                        Adverse to Other Class Members ........................................... 19

                4.      Brian Shevlin and Other Phoenix Shareowners Have
                        Conflicting Interests with Policyowners Who Did Not
                        Own Phoenix Shares .............................................................. 20

III.    Plaintiffs' Class Cannot Be Certified Under Rule 23(b)(3) ........................ 22

        A.      The Class That Plaintiffs Propose Cannot Be Ascertained ................ 23

        B.      Predominant Individual Issues Make Class Treatment
                Unworkable. ................................................................................... 25

                1.      Plaintiffs Have Failed to Demonstrate an Ability to Prove
                        Classwide Damages ............................................................... 26

                2.      Plaintiffs Cannot Link Damages to Their Theories of
                        Breach. .................................................................................. 34

i

3.   Predominately Individual Determinations are Necessary to Determine What, if Any, Damages Class Members Suffered. ..................................................................36

4.   Even if Aggregate Class Damages were Provable, Allocating Damages Among Class Members Necessitates Overwhelming Individual Issues. ............................................38

IV.   Plaintiffs' Claim For Unjust Enrichment Claim Cannot Be Certified Under Rule 23(b)(3) Because Plaintiffs Lack Standing................41

V.   Plaintiffs' Class Action Cannot Be Certified Under Rule 23(b)(1)(B)....................................................................................44

A.   Rule 23(b)(1)(B) Is Not Applicable To This Action For Monetary Damages...............................................................44

B.   Plaintiffs' Reliance On Issue Preclusion Is Unavailing. ....................48

CONCLUSION .....................................................................................50

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*Addiction Specialists, Inc. v. Twp. of Hampton,*
  411 F.3d 399 (3d Cir. 2005) ...............................................................41

*Am. List Corp. v. U.S. News & World Report, Inc.,*
  75 N.Y.2d 38 (1989) ...........................................................................36

*Amchem Prods., Inc. v. Windsor,*
  521 U.S. 591 (1997)..............................................................................14

*Baby Neal v. Casey,*
  43 F.3d 48 (3d Cir. 1994) ...................................................................16

*Balentine v. Triad Int'l Maint. Corp.,*
  No. 01-10357-BC, 2002 WL 31749163 (E.D. Mich. Oct. 17, 2002)................49

*Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.,*
  448 F.3d 573 (2d Cir. 2006) ...............................................................16

*Brushton-Moira Cent. Sch. Dist. v Fred H. Thomas Assocs., P.C.,*
  91 N.Y.2d 256 (1998) ....................................................................18, 36

*Carrera v. Bayer Corp.,*
  727 F.3d 300 (3d Cir. 2013) .........................................................23, 24

*Comcast Corp. v. Behrend,*
  133 S. Ct. 1426 (2013)...................................................................*passim*

*Cullen v. Whitman Med. Corp.,*
  188 F.R.D. 226 (E.D. Pa. 1999).........................................................45

*Daskalea v. Washington Humane Soc.,*
  275 F.R.D. 346 (D.D.C. 2011) ...........................................................47

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
  509 U.S. 579 (1994)..............................................................................33

*Dewey v. Volkswagen Aktiengesellschaft*,
    681 F.3d 170 (3d Cir. 2012) ........................................................14, 15

*Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*,
    631 F.3d 42 (2d Cir. 2011) ...............................................................15

*Fidelity & Cas. Co. v. Metro. Life Ins. Co.*,
    248 N.Y.S.2d 559 (N.Y. S. Ct. 1963)...............................................43

*Freund v. Washington Sq. Press, Inc.*,
    34 N.Y.2d 379 (1974) ..................................................................16, 18

*Gen. Tel. Co. of Sw. v. Falcon*,
    457 U.S. 147 (1983).................................................................*passim*

*Georgine v. Amchem Prods., Inc.*,
    83 F.3d 610 (3d Cir. 1996) ...............................................................13

*Grimes v. Vitalink Commc'ns Corp.*,
    17 F.3d 1553 (3d Cir. 1994) .............................................................44

*Hayes v. Wal-Mart Stores, Inc.*,
    725 F.3d 349 (3d Cir. 2013) ...........................................8, 9, 11, 50

*In re Agent Orange Prod. Liab. Litig.*,
    100 F.R.D. 718 (E.D.N.Y. 1983)......................................................45

*In re Am. Int'l Grp., Inc.*,
    965 A.2d 763 (Del. Ch. 2009) ..........................................................43

*In re Blood Reagents Antitrust Litig.*,
    783 F.3d 183 (3d Cir. 2015) ............................................22, 31, 33, 34

*In re DVI, Inc. Sec. Litig.*,
    639 F.3d 623 (3d Cir. 2011) .............................................................26

*In re Hydrogen Peroxide Antitrust Litig.*,
    552 F.3d 305 (3d Cir. 2008) ..............................................................8

*In re Metro. Life Derivative Litig.*,
    935 F. Supp. 286 (S.D.N.Y. 1996) ...................................................43

iv

*In re Paulsboro Derailment Cases*,
   2014 WL 4162790 (D.N.J. Aug. 20, 2014) ......................................................39

*In re Schering Plough Corp. Erisa Litig.*,
   589 F.3d 585 (3rd Cir. 2009) ................................................................13, 14

*In re Telectronics Pacing Sys., Inc.*,
   221 F.3d 870 (6th Cir. 2000) ..............................................................45

*Johnston v. HBO Film Mgmt., Inc.*,
   265 F.3d 178 (3d Cir. 2001) ..............................................................9, 23

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992)..............................................................42

*Mahmood v. Narciso*,
   549 F. App'x 99 (3d Cir. 2013) ..............................................................33

*Marcus v. BMW of N. Am., LLC*,
   687 F.3d 583 (3d Cir. 2012) ..............................................................25, 26

*Nationwide Mut. Fire Ins. Co. v. Hamilton, Inc.*,
   571 F.3d 299 (3d Cir. 2009) ..............................................................49

*Neale v. Volvo Cars of N. Am., LLC,*
   794 F.3d 353 (3d Cir. 2015) ..............................................................10, 26, 41

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001) ..............................................................16, 38, 40

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999)..............................................................44, 45, 49

*Oshana v. Coca-Cola Bottling Co.*,
   225 F.R.D. 575 (N.D. Ill. 2005)..............................................................45

*Parklane Hosiery Co. v. Shore*,
   439 U.S. 322 (1979)..............................................................48

*Quadrant Structured Prods. Co. v. Vertin*,
   115 A.3d 535, 554 (Del. Ch. 2015) ..............................................................43

*R&I Elecs., Inc. v. Neuman*,
   411 N.Y.S.2d 401 (N.Y. App. Div. 1978)............................................36

*Susan B. Anthony List v. Driehaus*,
   134 S. Ct. 2334 (2014).................................................................41, 42

*Taylor v. Sturgell*,
   553 U.S. 880 (2008)....................................................................48, 49

*Valley Drug Co. v. Geneva Pharm., Inc.*,
   350 F.3d 1181 (11th Cir. 2003) .........................................................15

*Wachtel v. Guardian Life Ins. Co. of Am.*,
   453 F 3d 179 (3d Cir. 2006) ...............................................................8

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011)..................................................9, 31, 46, 49

*Washington v. Aircap Indust.*,
   831 F. Supp. 1292 (D.S.C. 1993) ......................................................50

## OTHER AUTHORITIES

A. Miller, *An Overview of Federal Class Actions: Past, Present and Future*
   45 (Fed. Judicial Ctr. 1977) .............................................................45

Fed. R. Civ. P. 23 ..............................................................*passim*

Fed. R. Evid. 702 ..........................................................................18, 33

U.S. Const., Art. III...........................................................................42

Defendants Phoenix Life Insurance Company ("PLIC") and The Phoenix Companies, Inc. ("Phoenix") (jointly, "Defendants") submit this Brief in Opposition to Plaintiffs' Motion for Class Certification.

<u>**PRELIMINARY STATEMENT**</u>

This motion to certify a class of certain PLIC policyowners is presented in an unusual posture: the motion is made on the basis of a fully developed factual record, with the Court having framed key issues in adjudicating Defendants' motion for summary judgment. That prior history demonstrates that Plaintiffs' motion fails to meet the standards for certifying the class they propose.

Plaintiffs' complaint now rests on two claims: breach of contract against PLIC, and unjust enrichment against Phoenix. The claim of breach of contract is based on allegations that PLIC violated the terms of Plaintiffs' insurance policies, as implicitly amended by the Plan of Reorganization approved by the New York State Department of Insurance when the Phoenix Home Life Mutual Insurance Company demutualized. While Plaintiffs have different theories to support their claims, they all are based upon the same fundamental contention: that effective January 1, 2006, PLIC improperly reduced dividends payable on policies held in a Closed Block of policies set up at the time of demutualization. The Court's conclusion in denying Defendants' summary judgment motion that the Plaintiffs' claims raise questions of fact does not, however, mean that their claims can be

adjudicated on a classwide basis. They cannot, for several reasons.

*First,* Plaintiffs have failed to carry their burden to prove that they are members of the class, and thus able to serve as class representatives. Keith and Brian Shevlin are explicitly excluded by the class definition (because Keith never owned the policy at issue, and Brian was a shareholder of Phoenix). As for Erin Taylor, Plaintiffs offer no evidence to establish that she was not a shareholder of Phoenix—a showing necessary for class membership.

*Second*, several intra-class conflicts exist which demonstrate that the Plaintiffs (even if class members) are not typical or adequate representatives of all the class members they propose to represent.

*Third*, Plaintiffs have not established that the class can be ascertained given the absence of readily available means to identify excluded shareholders.

*Fourth*, Plaintiffs' own evidence demonstrates that they cannot prove classwide damages tied to a particular theory of liability, including their foundational allegation that the dividend scale reduction should have been postponed until 2009.

*Fifth*, there are predominating individual issues relating to the determination and allocation of damages to class members that foreclose the ability of the Court to determine Defendants' liability.

*Sixth*, Plaintiffs lack standing to assert the claim of unjust enrichment against

Phoenix.

Each of these grounds serves to defeat Plaintiffs' attempt to certify a class under Rule 23(b)(3). Plaintiffs also cannot rely upon Rule 23(b)(1)(B) to certify the class. That attempt suffers from a primary defect: the Rule is not available in actions, like this, where the class seeks monetary damages. Moreover, Plaintiffs' reasoning for invoking Rule 23(b)(1)(B) is fatally flawed.

For these reasons, the Court should deny Plaintiffs' motion to certify the proposed class.

## PROCEDURAL BACKGROUND

The original complaint in this action was filed in the Superior Court of New Jersey on November 4, 2009. After removing the case to this Court, Defendants made a motion to dismiss the complaint, which the Court granted in part and denied in part in an order entered August 24, 2010. Declaration of Joseph P. Moodhe, dated September 8, 2015 ("Moodhe Decl."), Ex. 1, August 24, 2010 Order at 1.[1] In rendering its decision, the Court stated that it desired an early test of the complaint by summary judgment practice before it entertained a motion to certify a class. Ex. 2, August 19, 2010 Hearing Tr. at 48. Plaintiffs thereafter filed a second amended complaint ("Compl.") which included three claims: one for

---

[1]  All references to "Ex." are to the exhibits attached to the Declaration of Joseph P. Moodhe in Support of Defendants' Opposition to Plaintiffs' Motion for Class Certification.

3

breach of contract against PLIC, and claims for violation of the New York

Consumer Protection Law and unjust enrichment against both Defendants. Ex. 3,

Compl. at 32-39.[2]

No doubt contrary to the Court's expectations, merits discovery continued

for thirty-eight months. At its conclusion, Defendants moved for summary

judgment. Ex. 6, Defendants' Summary Judgment Brief at 11-12. In a decision and

order entered June 30, 2014, the Court denied the motion. Ex. 5, Opinion Denying

Motion for Summary Judgment at 39. The Court subsequently denied both a

motion for reconsideration and a motion to certify certain questions for

interlocutory review. Ex. 7, Opinion Denying Motions for Reconsideration and

Interlocutory Appeal at 1.

Following the entry of these orders, the parties undertook additional

discovery directed at issues relating to Plaintiffs' proposal to certify a class. In

connection with that discovery, expert reports were exchanged which focused on

the issue of damages. Plaintiffs' proffered two reports from Peter Duran (who had

also provided two reports and testimony as an expert witness during merits

---

[2]   During briefing on Defendants' motion for summary judgment, Plaintiffs
abandoned the Consumer Protection Act claim. Plaintiffs also stated during oral
argument on that motion that they would abandon the unjust enrichment claim.
Ex. 4, Summary Judgment Tr. 103:7-16. However, the Court declined to dismiss
that claim as against Phoenix in denying the motion for summary judgment. Ex
5, Opinion Denying Motion for Summary Judgment at 38-39.

discovery) and tendered him for a deposition. Ex. 8, J. Peter Duran Class Certification Expert Report, March 16, 2015 ("Duran III"); Ex. 9, J. Peter Duran Class Certification Rebuttal Report, June 3, 2015 ("Duran IV"). Defendants submitted a report from Darryl Wagner (who likewise had submitted expert testimony during merits discovery), but Plaintiffs chose not to take his deposition. Moodhe Decl. at ¶ 2 and Ex. 10, Darryl G. Wagner Class Certification Report, May 6, 2015 ("Wagner II"). Following the completion of class discovery, Plaintiffs filed their motion for class certification on July 16, 2015.

In their motion, Plaintiffs seek to certify a class under Fed. R. Civ. P. 23(b)(1)(B) and (b)(3), consisting of:

> All past and present owners of Phoenix Life Insurance Company life insurance policies included in the company's "Closed Block" of dividend-paying policies and in-force as of the 2006 policy anniversary date, other than policyholders who (1) are officers, directors or stockholders of the Defendants; (2) members of the Federal judiciary; or (3) employees of the Federal judiciary.

*See* Brief In Support of Plaintiffs' Motion for Class Certification ("Pl. Br.") at 13.

## FACTUAL BACKGROUND

Plaintiffs' opening brief devotes several pages to summarizing the purported merits of their claims against Defendants. However, the strength of their claims is not at issue in this motion. Rather, the sole question presented by this motion is whether the claims asserted are capable of resolution as a class action in accordance with Rule 23. Thus, without conceding the validity of any of Plaintiffs'

allegations, and reserving all of their defenses (including those rejected by the Court in its prior rulings), Defendants submit that the following allegations and facts are those principally relevant to the determination of this motion.

Plaintiffs' fundamental claim is that PLIC wrongfully reduced the dividend scale for Closed Block policies as of January 1, 2006 (the "2006 Scale Change").[3] Plaintiffs advance four theories for arguing that PLIC's decision to implement the 2006 Scale Change breached the terms of their policies: (i) that it was improper to reduce the dividend scale until the Closed Block asset to liability ratio had fallen below that originally modeled by PLIC by at least 50 basis points (the "50 Basis Point Theory"); (ii) that PLIC improperly changed the reinvestment rate it used in its formulas from an average historical yield to a forward yield curve (the "Reinvestment Rate Theory"); (iii) that PLIC omitted a financial asset, known as the DAC tax asset, in computing Closed Block assets (the "DAC Tax Theory"); and (iv) that PLIC re-ordered the application of certain factors in calculating individual policy dividends, in violation of an alleged practice to pay a minimum dividend to Plaintiffs (the "Minimum Dividend Theory"). *See* Pl. Br. at 8-13.

---

[3]   While the Amended Complaint alleged that a second reduction of the dividend scale implemented as of January 1, 2009 was also improper, Plaintiffs have never proferred any evidence to support that allegation, and their experts have expressly disclaimed offering any opinions on that subject. Ex. 11, J. Peter Duran June 11, 2015 Dep. Tr. 60:6-25 ("Duran II Dep. Tr."); Ex. 12, Edward W. Buttner Dep. Tr. 10:22-11:6 ("Buttner Dep. Tr.").

These allegations purport to support Plaintiffs' two claims. *First*, they rely on these allegations to claim that PLIC breached the contractual obligation of their policies as to the payment of dividends. *Second*, they assert that the reduced policyowner dividends enabled PLIC to pay a larger dividend to its parent shareholder, Phoenix, than it otherwise could have, thereby unjustly enriching Phoenix. *Id*.

As noted above, as part of merits and class discovery, Plaintiffs' presented Peter Duran as an actuarial expert, who prepared four reports.[4]  In these reports, Mr. Duran set forth his analysis for calculating damages, as well as results related to that analysis. Mr. Duran was also deposed on two occasions, once as part of merits discovery and once as part of class discovery.[5]  Plaintiffs' evidence of class damages is based entirely on Mr. Duran's analysis and opinion.

## ARGUMENT

### I.     Standard for Class Certification

Plaintiffs bear the burden of proof to establish that the requirements of Rule 23 have been met by a preponderance of the evidence. *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 354 (3d Cir. 2013). The movant "must affirmatively

---

[4]  *See* Ex. 13, J. Peter Duran Actuarial Expert Report, July 23, 2013 ("Duran I"); Ex. 14, J. Peter Duran Actuarial Rebuttal Report, September 30, 2013 ("Duran II"); Ex. 8, Duran III; Ex. 9, Duran IV.

[5]  Ex. 15, J. Peter Duran October 2, 2013 Dep. Tr. ("Duran I Dep. Tr."); Ex. 11, Duran II Dep. Tr.

demonstrate his compliance" with Rule 23 including "evidentiary proof [that] at least one of the provision s of Rule 23(b)" is met. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). In determining a motion to certify a class, the trial court must analyze each of the claims raised by the complaint separately to ensure it is capable of being treated on a classwide basis. *Wachtel v. Guardian Life Ins. Co. of Am.*, 453 F 3d 179, 184 (3d Cir. 2006); Fed. R. Civ. P. 23(c)(1)(B). The trial court is obligated to carefully consider and then to specify the claims, defenses and other issues that are to be treated as class matters in the lawsuit. *Id.*

Before certifying a class, a trial court must "consider carefully all relevant evidence and make a definitive determination that the requirements of Rule 23 have been met." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 320 (3d Cir. 2008). It is thus "not only . . . appropriate, but also necessary, for the district court to examine the factual record underlying plaintiffs' allegations in making its certification decision." *Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 189 (3d Cir. 2001). This analysis will "frequently entail 'overlap with the merits of the plaintiff's underlying claim' . . . because the 'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Comcast*, 133 S. Ct. at 1432 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551-52 (2011)). Where the proceedings have advanced to the point of a well-developed record, "there is no

reason . . . at this stage of these lengthy judicial proceedings not to proceed [to assess the propriety of a class action] in light of the evidence actually presented." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 163 (1983).

## II.     Plaintiffs Fail To Meet the Requirements of Rule 23(a)

### A.     Plaintiffs Have Failed to Establish That They Are Members of the Proposed Class

The record shows that two of the Plaintiffs are not members of the class, and thus cannot serve as class representatives. *Hayes*, 725 F.3d at 360 ("It is axiomatic that the lead plaintiff must fit the class definition."). The third has not proved by a preponderance of the evidence that she meets the definition of a class member.

Plaintiffs seek to certify a class consisting of "all past or present owners of Phoenix Life Insurance Company life insurance policies included in the company's "Closed Block" of dividend-paying policies and in-force as of the 2006 policy anniversary date . . . ." Pl. Br. at 13. Clearly, the Plaintiffs sought to include within the proposed class all policyowners in the Closed Block at the time PLIC implemented the 2006 Scale Change (subject to specific exclusions). Unfortunately, Plaintiff Keith Shevlin never owned the insurance policy under which he was insured. Rather, his father Kenneth (who originally bought all of the Plaintiffs' policies) continuously owned Keith's policy at all relevant times. *See* Ex. 16, Keith Shevlin Dep. Tr. 21:12-22:23. Accordingly, Keith Shevlin is not a

9

member of the class and cannot be a class representative.[6]

The class definition proposed by Plaintiffs goes on to set forth several exclusions, one of which excludes all "officers, directors, or *stockholders* of the Defendants . . . ." Pl. Br. at 13 (emphasis supplied). Since Phoenix is the only stockholder of PLIC (Ex 3, Compl. at ¶ 13), the exclusion affects only policyowners who are stockholders of Phoenix, whose shares are publicly traded. The reason for the exclusion of Phoenix shareholders is obvious. Plaintiffs argue that the ulterior objective for the 2006 Scale Change (albeit without a shred of evidentiary support) was to increase the shareholder dividend PLIC paid to Phoenix. *See* Ex. 3, Compl. Count V. That additional dividend allegedly inured to the benefit of the shareholders of Phoenix. *Id*. at ¶ 108-109; ¶ 131 (p) and (q). Thus, Plaintiffs recognized an inherent conflict between Closed Block policyowners—who allegedly received smaller policy dividends—and Phoenix's shareholders, who allegedly benefited from the increased PLIC dividend paid to Phoenix.

Plaintiffs seek to eliminate that clear conflict by excluding from the class any Closed Block policyowners who also were shareholders of Phoenix. What

---

[6] As is evident, since Keith Shevlin never owned the policy as to which dividends were payable, he lacks standing to assert the claims set forth in the Amended Complaint. Therefore, his individual claims must be dismissed with prejudice. *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 359 (3d Cir. 2015).

Plaintiffs overlook is that an overwhelming majority of Closed Block policyowners received shares in Phoenix as a result of the demutualization. Affidavit of Naomi Baline Kleinman ("Kleinman Aff.") at ¶ 2. Those shares were received in order to compensate the policyowners for giving up their mutual interests in Phoenix Home. *See* Ex. 17, Plan of Reorganization, Article I, at 4, Article II ("Common Stock"). Redacted - Subject of Motion to Seal

. Kleinman Aff. at ¶ 3.  By the terms of the class definition, which was deliberately crafted to exclude shareholders of Phoenix, Brian also is not a member of the class, and thus cannot be a class representative.

That leaves Erin Taylor. Plaintiffs bear the burden to prove that Erin Taylor is a class member and thus eligible to represent the class. *Hayes*, 725 F.3d at 354.

Redacted - Subject of Motion to Seal

. Kleinman Aff. at ¶ 3.  However, that is insufficient to establish class membership. Shares of Phoenix are publicly traded, so it is quite possible that Ms. Taylor acquired Phoenix shares during the class period. Yet Plaintiffs submit no evidence to demonstrate that Ms. Taylor was not a shareholder of Phoenix between 2006-2008, a necessary criterion that Plaintiffs created for class membership.

In short, neither Keith nor Brian are eligible members of the class and *a fortiori* cannot be typical members or adequate representatives of the proposed class' interests. Further, while Erin Taylor may be a policyowner, Plaintiffs have not established that Ms. Taylor falls outside the exclusion they carefully crafted. Accordingly, Plaintiffs have failed to meet their essential burden to prove they are class members eligible to serve as class representatives.[7] They thus fail to meet the requirements of Rule 23, dooming their motion. *Falcon,* 457 U.S. at 156.

### B.     The Typicality and Adequacy Requirements of Rule 23(a)(3) and (4) Are Not Met

A party seeking to certify a class must satisfy the four requirements of Rule 23(a), which are:

(1)     the class is so numerous that joinder of all members is impracticable;

(2)     there are questions of law or fact common to the class;

(3)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4)     the representative parties will fairly and adequately protect the interests of the class.

Defendants do not contest that Plaintiffs can satisfy the requirements of

---

[7]   Defendants anticipate that Plaintiffs may seek simply to alter their definition of the class to remove the exclusion for shareholders. But the conflict they identified is real and palpable, and cannot be whitewashed away. Moreover, as discussed below, the presence in the class of shareholders who may have received the benefit of the increased dividends paid to Phoenix inordinately complicates the analysis of whether and to what extent such dual status policyowners/shareholders were damaged under Plaintiffs' theory of liability.

numerosity and the existence of some common questions of fact and law. Defendants submit, however, that Plaintiffs have failed to demonstrate that the class representatives have claims and defenses that are typical of all class members, or that they are in a position to adequately protect the interests of the proposed class.

To some extent, the requirements of typicality and adequacy of representation overlap. *Falcon*, 451U.S. at 157 n.13; *Georgine v. Amchem Prods., Inc.*, 83 F.3d 610, 632 (3d Cir. 1996), *aff'd sub nom*, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997).  The typicality requirement of Rule 23(a)(3) is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absent class members. *See In re Schering Plough Corp. Erisa Litig.*, 589 F.3d 585, 599 (3rd Cir. 2009). It helps to ensure "that the class representatives are sufficiently *similar* to the rest of the class—in terms of their legal claims, factual circumstances, and stake in the litigation—so that certifying those individuals to represent the class will be fair to the rest of the proposed class." *Schering*, 589 F.3d at 597; *Falcon*, 457 U.S. at 156 ("We have repeatedly held that a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." (internal quotation marks omitted)). As Plaintiffs acknowledge, "the claims of the class representative must be generally the same as those of the class in terms of

both (a) the legal theory advanced and (b) the factual circumstances underlying that theory" and that "the interests and incentives of the representative must be sufficiently aligned with those of the class." *Schering*, 589 F.3d at 599; *see* Pl. Br. at 18.

Under Rule 23(a)(4), Plaintiffs must further establish that the representative will fairly and adequately protect the interests of the class. The Supreme Court has explained that "[t]he adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). "[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 183 (3d Cir. 2012). The adequacy inquiry assesses "(1) whether an intra-class conflict exists; and if so (2) whether that conflict is 'fundamental.'" *Id.* at 184. "A fundamental conflict exists where some [class] members claim to have been harmed by the same conduct that benefitted other members of the class." *Id.* (quoting *Valley Drug Co. v. Geneva Pharm., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003)). The interrelationship between the two subsections can be readily seen—it is difficult to conceive how a class representative who is conflicted with regard to other class members, can possibly be deemed as having claims and defenses aligned with and thus typical of those

same members.

Plaintiffs cannot establish that any Plaintiff is a "typical" class member or an "adequate" class representative. Their circumstances and the evidence before the Court illustrate that the proposed class is fractured by at least three separate intra-class conflicts, and a latent fourth: (i) policyowners who benefited from the 2006 Scale Change, and those who did not; (ii) policyowners who maintain their policies, and those who do not; and (iii) policyowners who allegedly are entitled to minimum dividends, and those who are not; and (iv) policyowners who did not own Phoenix shares, and those who did.

### 1.    Not All Policyowners in the Proposed Class Suffered Class Damages

Both class claims require Plaintiffs to prove the existence of some measurable monetary damage in order to state a claim for liability. *See Diesel Props S.R.L. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (existence of damages required to state a *prima facie* claim for breach of contract); *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc.*, 448 F.3d 573, 586 (2d Cir. 2006) (*prima facie* claim for unjust enrichment requires enrichment "at the plaintiff's expense").[8]

---

[8]   This requirement is entirely distinct from the requirement under New York law that, after liability has been established, a plaintiff must show that its damages are non-speculative and calculable. *Cf. Freund v. Washington Sq. Press, Inc.*, 34 N.Y.2d 379, 382 (1974) (proof of contract interest in future royalties sufficient

In order to evaluate whether Plaintiffs or other class members have been damaged, the finder of fact must assess all the facts and circumstances, including whether the alleged misconduct caused no harm to or actually benefited him or her. *See Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc*., 259 F.3d 154, 189 (3d Cir. 2001), *as amended* (Oct. 16, 2001) ("the putative class must first demonstrate economic loss on a common basis. As noted, the issue is not the calculation of damages, but whether or not class members have any claims at all.").[9]

Plaintiffs have never disputed that some members of the prospective class were unaffected or even better off under the dividend scale adopted in 2006. As Plaintiffs' damages expert Peter Duran stated, "[t]here are likely to be some policies in the closed block whose dividends were increased [as a result of the 2006 Scale Change]." *See* Ex. 11, Duran II Dep. Tr. 43:2-11; *see also* Ex. 18, Phoenix 2006 Dividend Scale Q&A (Redacted - Subject of Motion to Seal

---

to establish liability for breach of contract, but too speculative for an award of more than nominal damages). This requirement is discussed *infra* at 36-40.

[9] Plaintiffs' citation to *Baby Neal v. Casey,* 43 F.3d 48 (3d Cir. 1994), is not to the contrary. *Baby Neal*, 43 F.3d at 58 (typicality may be found under a common course of conduct theory in spite of factual differences when liability is "*based on the same legal theory*") (emphasis supplied). The uninjured members of the proposed class share no legal theory of liability with Plaintiffs.

Redacted - Subject of Motion to Seal

). The fact that some members of the proposed class were affirmatively *benefited* by the challenged dividend scale change, or were unaffected, highlights in the clearest terms possible that the Plaintiffs' interests are not aligned with all in their proposed class. Plaintiffs ignore this most basic conflict among members of their defined class.

> ### 2.    Current Policyowners Have Interests Adverse to Class Members Whose Policies Are No Longer In Force

Plaintiffs' contract theory posits that because Defendants wrongfully reduced the dividend scale policyholders received a smaller distribution of dividends from Closed Block funds than they otherwise would have received. The implication of Plaintiffs' theory is that the Closed Block therefore remained *overfunded* because it retained too much money, rather than distributing that money as dividends.

Plaintiffs' contract remedy, as in any New York contract action, is to place the class "in as good a position as it would have been had the contract been performed." *Brushton-Moira Cent. Sch. Dist. v Fred H. Thomas Assocs., P.C.*, 91 N.Y.2d 256, 261 (1998). Placing the class in the position it would have been based on the former dividend scale entails distributing retained Closed Block funds to those who allegedly should have collected a higher dividend payment in the class

period years.[10] This requested redistribution of Closed Block funds creates another irreconcilable conflict in incentives among those current policyowners who continue to have an interest in the solvency of the Closed Block and payment of future dividends, and those who no longer do because their policies are terminated.

A reallocation of present day Closed Block funds to increase a dividend issued to policyholders in prior years would amount to a transfer from current Closed Block policyholders to a different, larger group of policyholders whose polices were in force during the class period. A policyowner whose policy is no longer in force (like Erin Taylor) will have every incentive to maximize the transfer from the current Closed Block assets (in which she has no financial interest) to herself. Conversely, those policyholders whose policies remain in force will be negatively impacted by any damages awarded out of Closed Block assets, since that will decrease the assets available to pay dividends on existing policies,

---

[10] Plaintiffs have elsewhere suggested—by way of assumptions made by Mr. Duran—that damages in this case might properly be paid from outside the Closed Block. Ex. 9, Duran IV at 13-14. There is no logical basis for that assertion. The funds that were not distributed as dividends remained in the Closed Block. Moreover, there is no legal basis for Mr. Duran's proposal, which is not competent expert testimony for him to provide and thus inadmissible under Fed. R. Evid. 702. Bringing additional funds from outside the Closed Block to satisfy Plaintiffs' contract claim to distribute assets they claim remained in the Closed Block would amount to an impermissible windfall, not a contract remedy. *See Freund*, 34 N.Y.2d at 382 ("[I]t is . . . fundamental that the injured party should not recover more from the breach than he would have gained had the contract been fully performed.").

and may lead to further reductions in the dividend scale in order to conserve assets (this is particularly so since Plaintiffs seek interest on the undistributed dividends). This misalignment of interests and incentives makes clear why none of the Plaintiffs can possibly be typical of these two diametrically adverse groups.

### 3.    Those Purportedly Entitled to "Minimum Dividends" Are Adverse to Other Class Members

In Plaintiffs' recitation of purported "common questions," they admit that one—regarding payment of so-called "minimum dividends"—applies only to "class members that were paid minimum dividends prior to the 2006 scale change." Pl. Br. 16. Plaintiffs provide no argument, much less evidence, that this legal theory is shared by all in the proposed class. In fact, their expert concedes he has no idea who falls within this group of policyowners, nor how many there may be in the group. Ex. 11, Duran II Dep. Tr., 139:10-15 ("You don't know how many policies fall into Group 3 [the group receiving minimum dividends]? A. No, I don't.").

Plaintiff's "minimum dividend" theory sets up a significant misalignment of interests and incentives within the broad proposed class, between those in the minimum dividend group (allegedly including Plaintiffs) and those outside the group. Duran flatly conceded this conflict. *Id*. 139:24-140:3 ("Q: Okay. So to – to some extent at least, the interest of Group 3 policyowners [those allegedly entitled to minimum dividends] are in tension with those of [Groups] one and two? A: Yes.

19

That tension existed from the issuance of those policies."). Moreover, Mr. Duran opined that "minimum dividends" should continue absent "extreme circumstances." Ex. 8, Duran III at 13; Ex. 11, Duran II Dep. Tr. 132:6-134:5. Under this unique theory, a scale retaining so-called "minimum dividends" might extend beyond the class period, further eroding the assets in the Closed Block. As Mr. Duran admits, this clearly creates a conflict, insofar as class members who are not entitled to minimum dividends would be hurt by Plaintiffs pursuing a "minimum dividend" theory that would benefit one group *ad infinitum* at the expense of deeper dividend cuts to other class members. Ex. 11, Duran II Dep. Tr. 139:16-23. Again, Plaintiffs cannot be said to have claims typical of the class as a whole, or adequately represent the interests of class members whose policies would not entitle them to such a claimed minimum dividend.

4. **Brian Shevlin and Other Phoenix Shareowners Have Conflicting Interests with Policyowners Who Did Not Own Phoenix Shares**

Under Plaintiffs' theory of the case, the reduction of the aggregate dividends paid to the Closed Block enabled PLIC to pay greater dividends to Phoenix after January 1, 2006. In particular, for their second claim, Plaintiffs seek to hold Phoenix liable for unjust enrichment to the extent that it received additional

dividends as a result of PLIC having reduced the Closed Block dividends.[11]

That allegation puts the class of policyowners squarely at odds with shareholders of Phoenix, whose economic interest is to have Phoenix retain any dividends that it received from PLIC, not disgorge them. Thus, if Phoenix shareowners were not excluded from the class by Plaintiffs' proposed definition, Brian Shevlin and numerous unidentified others have interests that diverge from policyowners who did not own Phoenix shares. In other words, while policyowners who did not own shares of Phoenix would have no qualms in pressing the unjust enrichment claim against Phoenix, policyowners who held Phoenix shares (such as Brian Shevlin) would have a contrary interest in resisting that claim.

As discussed above, Plaintiffs currently negate that conflict by excluding Phoenix shareholders. That limitation is necessary and unavoidable given Plaintiffs' unjust enrichment claim. But the consequence is to exclude large numbers of policyowners whose policies may have had their dividends reduced— an outcome against which they would be motivated to object. Kleinman Aff. at ¶ 4. Moreover, as discussed *infra* at 25-26 & 37 n.17, the exclusion of these shareholders limits and complicates the computation of class (as well as individual) damages. Should Plaintiffs invite the Court to redefine the class to eliminate that

---

[11] Plaintiffs have not quantified what the amount of the additional dividend underlying their unjust enrichment claim is, but they allege that the additional dividends were paid through 2008. *See* Ex. 3, Compl. at ¶¶ 109-11.

exclusion, this Court should not do so given this inherent conflict, as well as the unavoidable need to consider their shareholder status in determining damages whether or not they are class members.

        \*        \*        \*        \*        \*        \*

In sum, each of these conflicts, taken individually or as a whole, forecloses Plaintiffs' argument that any class representative is typical of the claims of the proposed class, which is beset by conflicting interests and incentives, or that they can adequately represent the class members' interests.

## III.   Plaintiffs' Class Cannot Be Certified Under Rule 23(b)(3)

In addition to meeting the requirements of Rule 23(a), Plaintiffs also have the burden to establish that one of the three subsections for Rule 23(b) is met. *See In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015). Plaintiffs invoke both Rule 23(b)(3) and (b)(1)(B) as a basis for certifying the class. The record before the Court demonstrates that Plaintiffs have failed to show that certification can be based on either subsection.

A class action can be certified under Rule 23(b)(3) if Plaintiffs establish that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Among the factors specified in the Rule for making this determination is "the

likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(D).

The fact that there may be some common issues of fact and law sufficient to satisfy Rule 23(a)(2) is not enough to meet the greater demand of Rule 23(b)(3) that those issues predominate. The predominance requirement is closely linked to the consideration of how difficult the action would be managed as a class, insofar as the need to devote attention to a substantial number of issues specific to individual class members would frustrate the ability of the court to reach a determination that would have classwide applicability. *Johnston*, 265 F.3d at 185-86 (holding that because individualized assessments were required to determine key, predominant issues, there would be "insurmountable manageability problems," and that as such, the predominance requirement of Rule 23(b)(3) was not met). Here, there are several issues requiring individual determination that would overwhelm the Court and prevent determinations common to the class.

## A.    The Class That Plaintiffs Propose Cannot Be Ascertained

Plaintiffs acknowledge in their opening brief that the law of this Circuit demands that a "plaintiff seeking certification of a Rule 23(b)(3) class must prove by a preponderance of the evidence that the class is ascertainable." Pl. Br. at 24; *see also Carrera v. Bayer Corp.*, 727 F.3d 300, 306 (3d Cir. 2013) ("[A] plaintiff must show, by a preponderance of the evidence, that the class is currently and readily ascertainable based on objective criteria . . . ."). As they further admit, that

burden requires them to establish that the class can be defined with reference to objective criteria and that "there is a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition." Pl. Br. at 24-25 (internal citation and quotation marks omitted); *see also Carrera*, 727 F.3d at 307.

Plaintiffs seek to define the class using objective criteria, such as who owned policies and who owned Phoenix shares during the class period. In order to meet the second requirement of a "reliable and administratively feasible mechanism" to identify class members using those criteria, Plaintiffs assert that class members can be easily identified from PLIC's records. Pl. Br. at 25. That is not true.

While it is the case that those who held policies assigned to the Closed Block at any given time can be identified through PLIC's systems, it is not the case that shareholders of Phoenix during the relevant period can be reliably or readily identified from Phoenix's internal records. Phoenix will have certain information—for example, the identities of those who were issued shares at the time of demutualization. However, Phoenix will not have complete information as to policyowners who owned shares after that.  From 2007 and thereafter, it can identify only those record shareholders as of the record date for the annual meeting.  It cannot identify those who held shares in the name of a brokerage firm, bank or other nominee—a common device used by shareholders of public

companies like Phoenix. Kleinman Aff. at ¶ 5. In addition, because its transfer agent is not required to retain records if an account closed more than seven years ago, records may not be available outside Phoenix for those who held shares but closed their accounts during the class period. *Id*. at ¶ 6. Given that a large majority of Closed Block policyowners received shares of Phoenix at the time of demutualization, and others may have bought them in the market prior to or during the years at issue, ascertaining who is in the class presents a formidable challenge that Plaintiffs have simply overlooked.[12]

### B.   Predominant Individual Issues Make Class Treatment Unworkable

Plaintiffs expend two brief paragraphs that purport to address how common questions of law or fact related to "liability" in this case predominate over individual questions. Plaintiffs' disarmingly simplistic discussion of the predominance requirement cannot mask the complexities inherent in their claims.

Initially, Plaintiffs' invitation to view Rule 23(b)(3)'s predominance inquiry

---

[12] The need here is very different than what might apply in a securities fraud class action. There, shareholders may be required to provide brokerage statements documenting when they bought and sold shares to establish their eligibility to participate in the class action recovery. Here, policyowners are being required to confirm a negative proposition—that they were *not* Phoenix shareholders—in order *not to be excluded* from participation. Thus, policyowners are disincentivized to provide the necessary information that would exclude them from the class, creating the same sort of unreliable self-identifying concerns that have troubled the courts in considering class certifications. *See Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 594 (3d Cir. 2012).

as a bifurcated inquiry involving the issues of "liability" on the one hand, and the issue of "damages" on the other, is inconsistent with the law and their proffered claims. The predominance inquiry begins with the elements of the underlying cause of action. *Marcus*, 687 F.3d at 600 ("To assess predominance, a court at the certification stage must examine each element of a legal claim 'through the prism' of Rule 23(b)(3)") (quoting *In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 630 (3d Cir. 2011)). Rather than address these elements in a way that would allow the Court to conduct the requisite rigorous analysis, Plaintiffs simply list items of evidence they intend to reference and opine that they "cannot conceive of any individual issues implicated in the liability assessment." Pl. Br. at 27. However, there is one overriding substantive element (the need to establish damages) and one theory (entitlement to a minimum dividend) that defy common treatment and create an insurmountable impediment to certification under Rule 23(b)(3).

       **1.**    **Plaintiffs Have Failed to Demonstrate an Ability to Prove Classwide Damages[13]**

In *Comcast,* 133 S. Ct. 1426, the U.S. Supreme Court held that, where a damages model "falls far short of establishing that damages are capable of

---

[13] Defendants recognize that in ordinary circumstances the need to calculate individual damage awards is not an impediment to the certification of a class if the requirements of Rule 23 are otherwise met. *Neale*, 794 F.3d at 374-75. This case, however, falls outside the norm, given the nature of the class sought to be certified and the theories being pursued by Plaintiffs.

measurement on a classwide basis," a class may not be certified under Rule

23(b)(3). *Id.* at 1433. As the Court there explained, the trial court must consider the

efficacy of the damages model even though it may implicate the merits of the

claims. *Id*. at 1432. Ordinarily, because Rule 23 motions are heard and determined

prior to merits discovery, the trial court is confronted with a more limited record.

Here, however, because the Court determined to hear summary judgment motions

prior to taking up the issue of class certification, the Court has before it a fully

developed record, which it must consider in determining Plaintiffs' motion.

*Falcon*, 457 U.S. at 163. That record reveals that Plaintiffs "fall far short" of

demonstrating that they can prove classwide damages.

(a)   *Plaintiffs Cannot Establish the Damages Period*

Plaintiff's breach of contract claim (as well as its unjust enrichment claim) is

premised on an allegation that PLIC improperly reduced the dividend scale for

Closed Block policies beginning in 2006. Plaintiffs seek damages for the amount

of dividends that should have been paid had the scale not been improperly reduced,

through the period when they concede a dividend scale reduction could have been

implemented. While the theory seems simple enough, Plaintiffs have not

demonstrated that they can produce competent evidence of those damages.

Regardless of which theory of contract breach Plaintiffs pursue, their damage

model depends on establishing how prematurely PLIC reduced the dividend scale.

27

Yet, despite *four* reports prepared by Plaintiffs' damages expert, Peter Duran—
including two specifically for class certification that focused on damages—he
made no computation that established whether it was proper to adjust the scale in
2006, 2007 or 2008.[14]

In his opening report, Mr. Duran created the concept of the "Dividend
Change Deferral Period," or "DCDP", which he explained was the period during
which PLIC should have deferred reducing the dividend scale. Ex. 13, Duran I at
32.  At that time, Mr. Duran provided no analysis of how to calculate the DCDP.
Instead, without any foundation or explanation, he simply declared that he would
"use three years as a reasonable working *assumption*." *Id*. (emphasis supplied) His
second report did not elaborate on the basis of this assumption. Ex. 14, Duran II at
18.

During class discovery earlier this year, Plaintiffs submitted an opening
report by Mr. Duran, and a rebuttal report that responded to various points made by
Defendants' actuarial expert, Darryl Wagner. Both reports dealt solely with the
issue of damages. In his March 16, 2015 report, Mr. Duran articulated a slightly
refined definition of the DCDP as "the number of years beyond 2005 that, based on

---

[14] Mr. Duran made no analysis of whether the additional reduction in the dividend
scale that took place in 2009 was warranted, and Plaintiffs offer no evidence on
that change.  Ex.15, Duran I Dep. Tr. 35:23-36:5; Ex. 11, Duran II Dep. Tr.
60:6-25; *see also* note 3 *supra*. Thus, they effectively concede that, no later than
2009, a scale change at least equal to that adopted for 2006 was necessary.

PLIC's own stated criteria for changing the dividend scale, the 1999 dividend scale should have been maintained." Ex. 8, Duran III at 2. Mr. Duran noted that "the class-wide calculation of improperly withheld dividends is primarily dependent on the DCDP." *Id*. at 3. But while Mr. Duran laid out a protocol for determining what the DCDP was (*see Id*. at 4, Table 1), Mr. Duran never actually used that protocol to determine this essential underpinning of his damages analysis:

> Q.  And did you do the calculation of the amount of foregone dividends that's referenced in the first sentence underneath the table?
>
> A.  No.

Ex. 11, Duran II Dep. Tr. 39: 6-9. Nor did he do so in his final report, dated June 3, 2015 (*see* Duran IV), notwithstanding Mr. Wagner's intervening analysis that suggested that the data indicated PLIC was justified in reducing the scale as of 2006. *See* Ex. 10, Wagner II, dated May 6, 2015 at 7-9. In fact, in his final report, Mr. Duran completely diluted his opinion, stating only that "[t]he Dividend Change Deferral Period ("DCDP") is *greater than zero*." Ex. 9, Duran IV at 1 (emphasis supplied). That unquantified assertion was not based on following the protocol he had set forth in his Duran III, but on unidentified evidence and his non-specified professional and educational experience. *Id*. at 1. As such, it is meaningless as evidence of class damages.

The wholly undisciplined, speculative nature of Mr. Duran's indefinite

29

estimate of the DCDP was confirmed by his testimony. He reiterated that the DCDP was "a fundamental input into the damage calculation process" which could significantly impact the damages allegedly suffered by the class. Ex. 11, Duran II Dep. Tr. 34:2-3; 33:1-14. Yet, notwithstanding that the DCDP is the critical building block for his damages estimates, Mr. Duran admitted that he had made no computation of the DCDP. Ex. 11, Duran II Dep. Tr. 24:2-10. To the contrary, he conceded that his assumption that a three year period was "reasonable" was not based whatsoever on any analysis specific to PLIC (whether using his rubric or any other), but was simply based on his "*general* knowledge of the circumstances and, you know, what I understand to have happened to interest rates in 2006 and '7." Ex. 11, Duran II Dep. Tr. 25:11-14 (emphasis supplied).

Indeed, Mr. Duran freely admitted that the DCDP "is what it is. I might be wrong. It might only be two years, or it might be four years." Ex. 11, Duran II Dep. Tr. 26:20-22. When pressed, Mr. Duran denied that it might be no years (*id.* at 26:23-24), but went on to acknowledge the he "wouldn't be surprised if [the projected asset to liability ratio] was more than 50 points less than glide path" by the end of 2005. (*id.* at 26:25-27:19)—precisely the threshold that he argued would *justify* a reduction to the dividend scale. *Id.* at 19:5-11.

In sum, Plaintiffs present only Mr. Duran to support their claim that the class was damaged by PLIC's purported premature reduction of the Closed Block

dividend scale—but despite nearly three years of analysis and four reports, he cannot opine with the least degree of specificity how premature that change allegedly was. As Mr. Wagner opines (and as Mr. Duran declined to rebut analytically), evidence supports the conclusion that the scale reduction beginning in 2006 was appropriate. *See* Ex. 10, Wagner II at 7-9; Ex. 9, Duran IV at 1. Mr. Duran's "assumption," based only on his general knowledge and experience, is no substitute for the disciplined estimation he supports in principle but eschews in practice. Because Mr. Duran's opinion is nothing but speculation as to what is reasonable and "greater than zero," Plaintiffs fail to meet the legal requirements to perform a "rigorous analysis" of what class damages are. *Wal-Mart*, 131 S. Ct. at 2551-52.

Plaintiffs may be expected to argue that they are not required to prove now what the damages actually are, but need only establish that it is possible to compute damages. But an expert's damages model cannot satisfy the requirements of Rule 23(b)(3) by a promise that it "could evolve" to become admissible evidence at some later point. *In Re Blood Reagents*, 783 F.3d at 186. This rule applies with even greater force here—all discovery has been concluded, so there is no excuse for Plaintiffs, after four attempts, not to have offered specific expert evidence on the foundation of their damages claim—i.e., what the length of the DCDP is.

In any event, the record belies Plaintiffs' ability to belatedly pull a damages rabbit out of the record before the Court. Mr. Duran stated that he needed additional data to perform the analysis he thought was necessary to compute the DCDP. But he also admitted that he was not aware that such information was available to him.

> Q.   Do you anticipate doing any additional work before trial?
>
> A.   I haven't thought it through completely, but—well, looking [in] detail at what actually happened in 2007, '7 and '8. So not use Phoenix's estimates that they did in 2005 or '4, to be honest, I— I'm not sure it's possible to do this without the cooperation from Phoenix. But I would try to set it out, in some detail, the information that I'd like to have to do the confirmation.
>
> Q.   Have you done that before?
>
> A.   No.
>
> Q.   And do you know whether you have the information within the body of the discovery material that has been produced?
>
> A.   I don't think so.

Ex. 11, Duran II Dep. Tr. 56:7-57:2.

Thus, it is beyond dispute that Mr. Duran cannot cure the fatal deficiency of being unable to establish, by any competent expert testimony based on record evidence, the predicate for his damages analysis—the period of time over which PLIC improperly withheld dividends. Absent that, damages cannot be proved on a classwide basis, and thus it would be futile and improper to certify a class in this action.

(b)   *In Fact, Mr. Duran's Testimony on Damages Should be Excluded for Failing to Meet the Standards of Admissibility Set Forth in* Daubert

The Court's "gatekeeping" function set out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1994), applies fully to expert testimony proffered to demonstrate compliance with Rule 23. *In re Blood Reagents Antitrust Litig.*, 783 at 187. The Third Circuit has advised that "[u]nder *Daubert*, courts must address a 'trilogy of restrictions' before permitting the admission of expert testimony: qualification, reliability and fit." *Mahmood v. Narciso*, 549 F. App'x 99, 102 (3d Cir. 2013); *see also* Fed. R. Evid. 702. To establish reliability, an expert must demonstrate a "reasonable degree of scientific [or actuarial] certainty"—an expert's opinion cannot be based on "subjective belief or unsupported speculation." *See Mykolaitis*, 2015 WL 4078111, at *9.

As described above, Mr. Duran admits that the basis for his entire damages analysis, DCDP, must be calculated by a methodology he has never actually applied, that is an "assumption" and reduces to an opinion that it is "greater than zero." Mr. Duran's opinion on the DCDP—which is never stated with any degree of reasonable certainty—is unsupported by any quantitative analysis at all. *See Mahmood*, 549 F. App'x at 103 (exclusion of expert testimony proper where it "scarcely contained analysis . . . showing how [expert] reached his conclusions"). Accordingly, under the rules governing the admissibility of expert testimony, it

should be barred. *See In re Blood Reagents*, 783 F.3d at 187. Without that

testimony, Plaintiffs have no ability to prove class damages, leading inexorably to

the conclusion that class certification should be denied.

> **2.     Plaintiffs Cannot Link Damages to Their Theories of Breach**

There is a further complicating impediment to Plaintiffs' ability to meet their

burden on class damages. As discussed above, Plaintiffs advance four different

theories to support their contract claim. A key class theory is the Reinvestment

Rate Theory: the alleged improper change in what PLIC used as the asset

reinvestment rate. In order to determine damages on this theory, Plaintiffs first

need to recalculate Closed Block assets with the allegedly correct reinvestment

rate, and then compute the asset to liability ratios to see whether it changed the

point at which that ratio fell sufficiently below the original glidepath to warrant a

dividend scale change (under Plaintiffs' 50 Basis Point Theory).[15] But Mr. Duran

has done no work to determine what effect using his proposed alternative

reinvestment rate would have had on the asset to liability ratio that was used by

---

[15] Plaintiffs' first and second theories of liability are closely intertwined. While Mr. Duran acknowledges that PLIC's data showed the glidepath falling roughly 50 basis points below the original glidepath by the end of 2005, he asserts that this data is flawed because it did not use the correct reinvestment rate. *See* Ex. 13, Duran I at 31; Ex. 11, Duran II Dep. Tr. at 47:13-48:19. Thus, unless Plaintiffs are able to prove that PLIC improperly shifted to a lower investment rate that caused the glidepath to dip below the 50 basis point threshold Plaintiffs allege existed, Plaintiffs likely will not prevail on their 50 Basis Point Theory either.

PLIC: he did not do any research about his "estimated" reinvestment rate (Ex. 11, Duran II Dep. Tr. 26:1-14; 28:9-10), and he had no information about how that alternative compared to the reinvestment rate that PLIC used to calculate Closed Block assets. *Id.* at 28:9-30:6.

This lack of data and analysis, linked to a specific theory of liability, is precisely the shortcoming that the Supreme Court found in *Comcast* would defeat certification of a class. In *Comcast,* the Court held a class could not be certified because Plaintiffs' proffered damages theory was not focused on the single theory of antitrust liability left in the case. *Comcast*, 133 S. Ct. at 1433-34. The Plaintiffs here are faced with a similar lack of nexus. There is no evidence of actual or alternative reinvestment rates in the record that Mr. Duran used—or could use—to determine what the impact of incorporating a different reinvestment rate would have had on the asset to liability ratio of the Closed Block at any point in time. Because Plaintiffs have no means to quantify the damages associated with their theory that the wrong reinvestment rate was used, classwide damages are unprovable as to those theories of liability, and thus, under the holding of *Comcast*, a class may not be certified.[16]

---

[16] The Plaintiffs' two other theories (the DAC Tax Theory and the Minimum Dividend Theory) do not salvage the motion. While the DAC tax asset impact could be calculated on a year by year basis, Mr. Duran did not actually make that calculation. *See* Ex. 8, Duran III at 17; Ex. 11, Duran II Dep. Tr. 145:16-23. Because that calculation was not made, Mr. Duran did not offer any opinion as

### 3.   Predominately Individual Determinations are Necessary to Determine What, if Any, Damages Class Members Suffered

As Plaintiffs' admit, a proffered damages model "must be consistent with its liability case" in order to satisfy Rule 23(b)(3). *Comcast*, 133 S. Ct. at 1433; *see* Pl. Br. at 29. In New York, contract damages place the plaintiff "in as good a position as it would have been had the contract been performed." *Brushton-Moira*, 91 N.Y.2d at 261. A party seeking to establish damages upon a breach of contract must reduce such damages by costs saved or opportunities gained in light of the breach. *Am. List Corp. v. U.S. News & World Report, Inc.*, 75 N.Y.2d 38, 44 (1989) (holding that the appropriate measure of damages is "the balance owed by defendant under the contract less the costs reasonably saved by plaintiff as a result of the breach"); *R&I Elecs., Inc. v. Neuman*, 411 N.Y.S.2d 401, 404 (N.Y. App. Div. 1978) ("In some cases the breach of a contract may prevent a loss as well as cause one, and, insofar as it prevents loss, the amount saved should be credited to the wrongdoer.").

As discussed above, in order to determine if any class member was

---

to whether it would, or would not, have produced the 50 basis point deviation he argued was the test. Plaintiffs' only relevant evidence is actually from Mr. Buttner, who refused to characterize the impact of the omitted DAC tax asset as material. Ex. 12, Buttner Tr. 203:25-204:10. Mr. Duran also acknowledged that there is still an actuarial judgment to be made when the data indicates that the ratio is close to his criteria. Ex. 11, Duran II Dep. Tr. 50:16-25. Plaintiffs' fourth Minimum Dividend Theory, as discussed below, requires individualized analysis of every policy, and thus is inherently incapable of class disposition.

damaged, two questions will have to be addressed. *First*, it must be determined whether, when the 2006 Scale Change was applied to a class member's policy, the amount of dividends paid was actually reduced. *Second*, if the dividends were reduced then, for those policies remaining in force after 2008, it must be determined whether the amount of the dividend reduction was negated, in whole or in part, by the benefit that accrued from not having the scale further reduced in 2009 (as Plaintiffs effectively concede it would have been).[17]

Although Duran admits that payment of a larger dividend in 2006 would necessarily impact asset levels in the Closed Block in subsequent years (Ex. 15, Duran I Dep. Tr. 160:12-20), he also admits he made no effort to determine what the value of this was for Closed Block policyowners whose policies remained in force after 2008. Ex. 11, Duran II Dep. Tr. 81:5-82:15.[18] Thus, even if the Court were to determine that these complexities are not roadblocks to certification under Rule 23(a), they cannot be ignored as individual issues that must be addressed in determining PLIC's liability for damages to class members. Those individual issues will necessitate policy-by-policy assessments of data that is not in the

---

[17] For those who were shareholders (assuming the definition was changed to remove their exclusion), it must also be determined whether the amount of the dividend reduction was offset by the benefit of the dividend paid to Phoenix that allegedly was improper.

[18] While Closed Block policyowners clearly benefited by the additional dividends allegedly paid improperly to Phoenix, there is no evidence that Mr. Duran made any effort to calculate that benefit for class members.

discovery record and which Plaintiffs are not prepared to address; indeed, they shunned that work. These issues will mire down this proceeding even if common issues are adjudicated, and will stand intractably in the way of this Court's ability to enter a final judgment. *See Newton*, 259 F.3d at 192.

> ### 4. Even if Aggregate Class Damages were Provable, Allocating Damages Among Class Members Necessitates Overwhelming Individual Issues

While the discussion above reveals that Plaintiffs face insurmountable challenges in establishing what damages allegedly befell the class as a whole, there is a further impediment to allowing this action to proceed as a class action. Plaintiffs have no fair and practicable method for allocating the pool of damages among the Closed Block policyholders, putting aside the other individual issues discussed above.

In Mr. Duran's principal damages report (Duran III), he acknowledged that the policies in the Closed Block had a number of different dividend features that affected the amount of damage the respective policy allegedly incurred.[19] Ex. 8, Duran III at 2. As Mr. Duran explained, allocation of dividends among different

---

[19] In that sense, allocating damages to the Closed Block insurance policies differs from allocating damages on the basis of difference between the actual price of purchase or sale of a security and the correct market price. In a securities class action, all shares are treated the same, whereas Mr. Duran notes that the Closed Block policies must be analyzed for their individual dividend features. *See* Ex. 8, Duran III at 8-11 (grouping class members with respect to dividend payment options for purposes of separate analyses).

policyowners is based on the contribution principle, which means that dividends should be allocated to policies in proportion to the way they have contributed to the surplus (or income) generated by the policy. Ex. 11, Duran II Dep. Tr. 53:7-54:10. In his report, Mr. Duran acknowledged that there are a variety of dividend payment methods that should be taken into account in allocating whatever damages might be awarded. While he initially identified at least five groupings, he admitted that in fact Mr. Wagner's tally of at least 18 subgroups was more accurate. *Id.* 64:20-65:25; Ex. 10, Wagner II, at 5. Mr. Duran also conceded that there were hundreds of thousands of policies in the Closed Block (Redacted - Subject of Motion to Seal (Kleinman Aff. at ¶ 2)), and did not quarrel with Mr. Wagner's assertion that there are roughly 30,000 different cells within the Closed Block to which the damages calculation would have to be made using Mr. Duran's analysis. *See* Ex. 11, Duran II Dep. Tr. at 75:3-11; 77:13-19; Ex. 10, Wagner II at 12.

In short, Plaintiffs' damages model requires thousands of calculations that take account of the individual features of the policy. Ex. 10, Wagner II at 12. Given the complexity of this analysis, Plaintiffs' approach simply overwhelms any other common liability issues. The inability to render a judgment which includes an award to class members because of issues as to what those individual damages are is a further ground for refusing to certify a class. *In re Paulsboro Derailment*

39

*Cases*, 2014 WL 4162790, at \*12 (D.N.J. Aug. 20, 2014) ("Where proof of damages is essential to liability, the need for 'individualized proof of economic loss,' instead of through a formulaic calculation, can defeat predominance.") (citing *Newton*, 259 F.3d at 188).

In an effort to evade that conclusion, Mr. Duran offers a "simplified" damages approach, which allocates the aggregate amount of damages on a surrogate formula based on the proportion of the 2005 dividend policyowners received. *See* Ex. 9, Duran IV at 17. But as Mr. Duran's entire analysis conveys, this artificial allocation is unrelated to the "exact damages" that policyowners suffered. *Id.* And because it ignores the fact that policies were impacted differently by the interaction between increased mortality performance and declining interest rates – which vary by class of policies – such a blunderbuss approach would violate the contribution principle he pronounced as fundamental to the fair allocation of dividends that would underlie an award of damages to class members. Ex. 11, Duran II Dep. Tr. at 52:16-53:6. Certification of a class cannot be premised on a damages methodology that arbitrarily overcompensates some class members at the expense of shortchanging others. For this reason too, certification of the class should be denied.

**IV.    Plaintiffs' Claim For Unjust Enrichment Claim Cannot Be Certified Under Rule 23(b)(3) Because Plaintiffs Lack Standing**

Plaintiffs can prevail on their claim for unjust enrichment against Phoenix only if they first prove their breach of contract claim. That is because, unless they establish that PLIC improperly reduced Closed Block dividends, they cannot demonstrate that the reduction enabled PLIC to pay a larger dividend to Phoenix than it otherwise could have.  Since establishing the contract claim is the predicate for liability under the unjust enrichment claim, the same barriers to class certification discussed above apply to Plaintiffs' unjust enrichment claim.

But a separate threshold issue prevents certification of a class for the unjust enrichment claim. Closed Block policyholders of PLIC have no standing to assert unjust enrichment claims against Phoenix because they did not suffer any injury as policyowners of PLIC.

A court has an "obligation to assure [itself] of litigants' standing under Article III." *Neale*, 794 F.3d at 358. Standing is a component of subject matter jurisdiction which affects the ability of the court to render a judgment, whether in an individual or class action, and thus must be considered whenever raised. *See Susan B. Anthony List v. Driehaus,* 134 S. Ct. 2334, 2341 (2014) ("Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.' U.S. Const., Art. III, § 2. The doctrine of standing gives meaning to these constitutional limits . . . ."); *Addiction Specialists, Inc. v. Twp. of*

*Hampton,* 411 F.3d 399, 405 (3d Cir. 2005) (courts are "required to raise issues of standing *sua sponte* if such issues exist"). To meet the standing requirements imposed by Article III, a plaintiff must demonstrate "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.' *Driehaus*, 134 S. Ct. at 2341. "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Here, Plaintiffs suffered no cognizable injury.

Plaintiffs' unjust enrichment claim against Phoenix asserts that as a result of the 2006 Scale Change, PLIC was enabled to pay a larger dividend to its sole shareholder, Phoenix, from PLIC's assets. If assets were improperly removed from PLIC and provided to Phoenix in the form of dividends, then the only person with standing to pursue a claim against Phoenix for unjust enrichment is the company, PLIC, whose assets were used to pay that dividend.[20]

What Plaintiffs are actually attempting in this suit is a derivative action on behalf of PLIC. But under Delaware law (under which Phoenix is incorporated),

---

[20] While for this question it is irrelevant whether or not Closed Block assets were used, Plaintiffs have identified no evidence that such assets were used to pay the dividend to Phoenix, despite their speculation.

derivative actions may only be brought by shareholders.[21] Here, plaintiffs assert their claims on behalf of themselves and the class as policyowners, not shareholders of PLIC (which they indisputably are not). As policyowners, Plaintiffs are mere creditors of PLIC. That was their status prior to demutualization, when there were no shareholders of the insurance company. *See In re Metro. Life Derivative Litig.*, 935 F. Supp. 286, 292-93 (S.D.N.Y. 1996) (stating that "relationship between a mutual insurer and a policyholder 'is not of a fiduciary nature' but is instead that of a debtor and creditor"); *see also Fidelity & Cas. Co. v. Metro. Life Ins. Co.*, 248 N.Y.S.2d 559, 565 (N.Y. S. Ct. 1963) (stating that "the relationship between the company and its policyholder is essentially that of debtor and creditor measured by the contractual terms of the policy"). That status is crystal clear after demutualization—PLIC now has policyowners (including those in the Closed Block) and a separate, single shareholder (Phoenix). As mere creditors, Plaintiffs (and *a fortiori* all class members *qua* policyowners) have no standing to pursue any claim on behalf of PLIC, including a claim for unjust enrichment. *Cf.*, *e.g.*, *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 774 (Del. Ch. 2009) (derivative claims advanced against AIG by AIG shareholders, not AIG

---

[21] There is an exception under Delaware law that permits creditors to assert derivative claims where they can prove the corporation is insolvent. *See Quadrant Structured Prods. Co. v. Vertin,* 115 A.3d 535, 554 (Del. Ch. 2015). There is no such allegation here, nor could there be, as the evidence is indisputable that PLIC was and is solvent.

insureds).

Accordingly, there is no basis for certifying a class of policyowners with respect to the unjust enrichment claim, which should be dismissed with prejudice.

## V.     Plaintiffs' Class Action Cannot Be Certified Under Rule 23(b)(1)(B)

Plaintiffs' suggest that a class can also be certified under Rule 23(b)(1)(B). Rule 23(b)(1)(B) applies where:

> prosecuting separate actions by or against individual class members would create a risk of . . . adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

Fed. R. Civ. P. 23(b)(1) and (b)(1)(B); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 834 (1999). This provision is not available as a ground for certifying the class proposed by Plaintiffs.

### A.     Rule 23(b)(1)(B) Is Not Applicable To This Action For Monetary Damages

The "right to notice and a chance to opt out [under Rule 23(c)] has been thought not to apply to class actions maintained under subdivisions (b)(1) and (b)(2). Thus, Rule 23(b)(1) & (2) class actions are often referred to as mandatory class actions." *Grimes v. Vitalink Commc'ns Corp.*, 17 F.3d 1553, 1571 (3d Cir. 1994); *see also* Fed. R. Civ. P. 23 cmt. (2003) ("The opportunity to request exclusion from a proposed settlement is limited to members of a (b)(3) class."). Because of these features, certification under Rule 23(b)(1)(B) must be "carefully

scrutinized and sparingly utilized." *In re Telectronics Pacing Sys., Inc.,* 221 F.3d 870, 881 (6th Cir. 2000); *see also Oshana v. Coca-Cola Bottling Co.,* 225 F.R.D. 575, 584 (N.D. Ill. 2005).

The "paradigm" 23(b)(1)(B) case is a so-called "limited fund" case, where a class of plaintiffs seeks to recover more than the defendants can pay. *In re Agent Orange Prod. Liab. Litig.*, 100 F.R.D. 718, 725 (E.D.N.Y. 1983) ("The paradigm Rule 23(b)(1)(B) case is one in which there are multiple claimants to a limited fund . . . and there is a risk that if litigants are allowed to proceed on an individual basis those who sue first will deplete the fund and leave nothing for latecomers." (quoting A. Miller, *An Overview of Federal Class Actions: Past, Present and Future* 45 (Fed. Judicial Ctr. 1977)), *aff'd*, 818 F.2d 145 (2d Cir. 1987)); *see also Cullen v. Whitman Med. Corp.,* 188 F.R.D. 226, 236 (E.D. Pa. 1999) ("The most common use of subsection (b)(1)(B) class actions is in 'limited fund' cases, where claims are aggregated against a fund insufficient to satisfy all claims.").

Outside this context, the Supreme Court has sternly warned against the "adventurous application of Rule 23(b)(1)(B)," emphasizing the Due Process and Seventh Amendment problems inherent in mandatory actions for individualized money recoveries like this one. *Ortiz*, 527 U.S. at 845. Indeed, in *Ortiz* the Supreme Court expressed skepticism about whether "Rule 23(b)(1)(B) may ever be used to aggregate individual tort claims." *Id.* at 844-45.

The Supreme Court strongly reinforced that viewpoint in its most recent decision on the scope of the "mandatory class" provisions in Rule 23, where it rejected a mandatory class of plaintiff employees who sought back pay. *Wal-Mart*, 131 S. Ct. 2541, 2557-59. In so doing, the Court broadly held that "[g]iven [Rule 23's] structure, we think it *clear* that individualized monetary claims belong in Rule 23(b)(3)" because of the "procedural protections attending the (b)(3) class— predominance, superiority, mandatory notice, and the right to opt out . . . ." *Id*. at 2558 (emphasis supplied).

Plaintiffs have not established that any special considerations apply to their class which overrides the disapproval of a "mandatory class" expressed by the Supreme Court when monetary damages are sought. They instead rest their entire argument for certifying this class action under Rule 23(b)(1)(B) on an isolated 1966 comment in the Federal Rules of Civil Procedure, which indicated that one of the historical models for Rule 23(b)(1)(B) was found in actions by "shareholders to compel the declaration of a dividend." Fed. R. Civ. P. 23 cmt. (1966). That stray comment should be given no weight.

*First*, Plaintiffs do not cite a single case where a 23(b)(1)(B) class was certified in order to compel declaration of a dividend. *Second*, the 1966 Advisory Comment cautioned that although actions by shareholders to compel declaration of a dividend may be conducted as class actions, "the matter has been much obscured

46

[in the caselaw] by the insistence that each shareholder has an individual claim." Fed. R. Civ. P. 23 cmt. (1966). *Third*, this caveated observation has since been rebuffed by the Supreme Court's unequivocal view that Rule 23(b)(1)(B) should not be used where monetary damages are sought for individual class members.

In any event, this is simply not a case where shareholders are trying to fix their rights and compel a dividend. In the shareholder context, the declaration of a dividend would apply to every shareholder, and it would be relatively easy to distribute the dividend based on shares. In stark contrast, this matter involves complex actuarial calculations underpinning both the dividend scale and the method by which dividends are distributed to policyholders.

In counseling against the "adventurous application of Rule 23(b)(1)(B)," the Supreme Court's warnings indicate that "*departures from the historical models should not be undertaken lightly*." *Daskalea v. Washington Humane Soc.,* 275 F.R.D. 346, 366 (D.D.C. 2011) (emphasis supplied). Plaintiffs propose just such a departure, in disregard of the Supreme Court's emphatic disapproval of avoiding the rigorous protections of Rule 23(b)(3) in cases seeking monetary damages for class members. *See Wal-Mart*, 131 S. Ct. at 2557-59. This Court should not permit the Plaintiffs to escape the burden of establishing their entitlement to certification under Rule 23(b)(3) by resort to a novel, unprecedented application of Rule 23(b)(1)(B).

### B.    Plaintiffs' Reliance On Issue Preclusion Is Unavailing

Plaintiffs' theory that the specter of issue preclusion warrants certification

under Rule 23(b)(1)(B) is groundless. Traditionally issue preclusion, which

prevents the re-litigation of issues already determined by a fact finder, could only

be invoked by a party if the issue had been previously litigated between the same

parties. *See Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326-27 (1979)

(acknowledging contemporary standard that a party have "had a full and fair

opportunity to litigate" the issue). Issue preclusion against nonparties, however,

runs afoul of the "deep-rooted historic tradition that everyone should have his own

day in court." *Taylor v. Sturgell,* 553 U.S. 880, 892-93 (2008). In *Taylor*, the Court

identified only six exceptions to this general rule. None of them apply here.[22]

The fact that Plaintiffs received an adverse determination on their individual

claims would not preclude another policyowner from asserting the same issues and

_____

[22] The six recognized exceptions to the rule against nonparty preclusion are: 1) the nonparty agrees to be bound by the determination of issues in an action between others; 2) a substantive legal relationship—*i.e.* traditional privity—exists that binds the nonparty; 3) the nonparty was "adequately represented by someone with the same interests who [wa]s a party"—requiring an understanding that the party in the first action is acting in a representative capacity or special procedural protections (as in Fed. R. Civ. P. 23) in place in the original action to ensure the due process rights of nonparties; 4) the nonparty assumes control over the litigation in which the judgment is rendered; 5) the nonparty attempts to bring suit as the designated representative of someone who was a party in the prior litigation; and, 6) the nonparty falls under a special statutory scheme that "expressly foreclos[es] successive litigation by nonlitigants." *Nationwide Mut. Fire Ins. Co. v. Hamilton, Inc.*, 571 F.3d 299, 312-13 (3d Cir. 2009) (citing *Taylor,* 553 U.S. at 893-895).

claims in another court—which may view the law differently—or before another fact finder, which may view the evidence differently. *See Taylor*, 553 U.S. at 907 (rejecting application of issue preclusion against a nonparty to prior litigation); *Nationwide*, 571 F.3d at 310-314 (rejecting the doctrine of "virtual representation" and reversing application of collateral estoppel against a nonparty). If the law of preclusion were as Plaintiffs mistakenly interpret it, then any action where plaintiffs are allegedly injured by the same conduct of a defendant would be able to be certified under Rule 23(b)(1)(B). That clearly is not reflective of the case law strictly limiting the scope of Rule 23(b)(1)(B).

The single case that Plaintiffs rely on for their issue preclusion argument, *Washington v. Aircap Indust.*, 831 F. Supp. 1292 (D.S.C. 1993), is unpersuasive and distinguishable. In *Aircap,* the defendant did not oppose certification under Rule 23(b)(1)(B). Thus, the court did not consider any of the arguments set forth herein as to the inappropriateness of that subdivision of Rule 23 as a basis for certifying the class. The *Aircap* court's 1993 invocation of Rule 23(b)(1)(B) is also out of step with more recent binding jurisprudence, including the Supreme Court's decisions in *Ortiz* and *Wal-Mart.* It is no surprise that the thin reasoning in *Aircap* has been rejected by a court of comparable jurisdiction. *See Balentine v. Triad Int'l Maint. Corp.*, No. 01-10357-BC, 2002 WL 31749163 at *4 (E.D. Mich. Oct. 17,

2002) (considering and rejecting *Aircap*).[23]

In view of the faulty reasoning advanced by Plaintiffs in support of certification under Rule 23(b)(1)(B), and the clear disapprobation of the Supreme Court for using this subpart of Rule 23 in cases seeking monetary damages, Plaintiffs' motion to certify a Rule 23(b)(1)(B) class should be denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification should be denied, and Mr. Duran's testimony on damages excluded.

Respectfully submitted,

_____
Joseph P. Moodhe
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000

*/s/ Sheldon M. Finkelstein*
_____
Sheldon M. Finkelstein
PODVEY MEANOR CATENACCI HILDNER
COCOZIELLO & CHATTMAN
A PROFESSIONAL CORPORATION
The Legal Center
One Riverfront Plaza
Newark, New Jersey 07102
(973) 623-1000

Dated:  September 8, 2015

*Attorneys for Defendants*
*Phoenix Life Insurance Company and*
*The Phoenix Companies, Inc.*

---

[23] In addition, the *Aircap* court seems to have overlooked the underlying concerns articulated by the Supreme Court concerning lack of notice, as it mistakenly directed the plaintiff to amend the notice to conform to its decision to certify under Rule 23(b)(1)(B), despite that no notice is required for a mandatory class certified under Rule 23(b)(1)(B). *See* 831 F. Supp. at 1294.